**STATE of Tennessee**

v.

**David Eric PRICE.**

Court of Criminal Appeals of Tennessee, at Knoxville.

July 25, 2000.

Application for Permission to Appeal Denied by Supreme Court Feb. 26, 2001.

J. William Pope, Jr., Chattanooga, TN, for appellant, David Eric Price.

Paul G. Summers, Attorney General and Reporter, Marvin S. Blair, Jr., Assistant Attorney General, William Cox, District Attorney General, and Thomas J. Evans, Assistant District Attorney General, for appellee, State of Tennessee.

## OPINION

WADE, P.J., delivered the opinion of the court, in which SMITH and WITT, JJ., joined.

The defendant, David Eric Price, appeals convictions of first degree murder, aggravated robbery, and conspiracy to commit aggravated robbery, for which he received an effective sentence of life without the possibility of parole plus ten years. The defendant claims thirteen instances of error by the trial court, including admission of his wife's testimony on behalf of the state, denial of his motion to sever his trial from that of the codefendant, and admission of his tape recorded conversations with the codefendant. Because we find no reversible error, the judgment of the trial court is affirmed. The judgment for first degree murder is modified to establish that the felony murder is merged into the conviction for premeditated first degree murder.

The defendant, David Eric Price, was indicted for two counts of first degree murder (premeditated and felony), aggravated robbery, and conspiracy to commit aggravated robbery in connection with the murder of the victim, Rene Earl Cabirac, Sr. After a nine-day trial, verdicts of guilt were rendered on all four charges. At the conclusion of the guilt phase of the trial, the trial court merged the defendant's two first degree murder convictions and the jury sentenced the defendant to life imprisonment without the possibility of parole. The trial court imposed a consecutive sentence of ten years for the aggravated robbery and a concurrent sentence of five years for the conspiracy. The effective sentence is, therefore, life without the possibility of parole plus ten years.

In this appeal of right, the defendant raises the following thirteen issues:

1. whether the trial court erred by allowing the defendant's wife to testify for the state;

2. whether the trial court erred by denying the defendant's motion for severance from the trial of his co-defendant, Carl Durham;

3. whether the trial court erred by admitting tape recordings made by the codefendant of conversations he had with the defendant;

4. whether the trial court erred by admitting evidence regarding the defendant's tennis shoes;

5. whether the trial court erred by admitting DNA evidence on blood

droplets found in the victim's automobile;

6. whether the trial court erred by providing defense counsel a jury list only after voir dire had begun and by disallowing individual voir dire;

7. whether the trial court erred by allowing the state to examine two of its witnesses, Kevin Green and Jeanie Bliek, by leading questions and by allowing the witnesses to refer to their prior statements while testifying;

8. whether the trial court erred by admitting photographs and a videotape of the victim's body;

9. whether the trial court erred by refusing to enter a judgment of acquittal and allowing the jury to consider the charge of conspiracy to commit aggravated robbery;

10. whether the trial court erred by ordering that the sentence for aggravated robbery be served consecutively to the first degree murder sentence;

11. whether the trial court erred by failing to grant the defendant a new trial on the ground that the weight of the evidence was contrary to the jury's verdict of guilty on the defendant's first degree murder charges;

12. whether the trial court erred by submitting both of the defendant's first degree murder charges to the jury; and

13. whether the trial court erred in its instruction on the aggravating circumstances to be considered in sentencing the defendant for first degree murder.

We affirm the judgment of the trial court.

## FACTS

At trial, the defendant's wife, Staci Price, testified that on several occasions she had heard the defendant and the codefendant, Carl Durham, discuss robbing the victim, Rene Earl Cabirac, Sr. She recalled having heard one such discussion only a day or two before the victim was killed. On May 28, 1996, Ms. Price worked from 5:00 p.m. to 10:00 p.m. at Winn Dixie before returning to the apartment she shared with the defendant, their infant son, Durham, and Durham's girlfriend, Jeannie Bliek. Ms. Bliek, who was caring for the child, was the only adult at home. By 11:00 p.m., when Ms. Price left the apartment to return some movies to a Blockbuster video store, neither the defendant nor Durham had telephoned or returned to the apartment. Shortly after Ms. Price's return from Blockbuster, Durham returned, but soon left to look for the defendant. Later, Durham telephoned to say that he had not found the defendant. At approximately 12:30 a.m., Durham came back to the apartment to pick up Ms. Bliek, who agreed to assist in the search.

According to Ms. Price, the defendant called the apartment shortly after Ms. Bliek left. Upon learning that neither Durham nor Ms. Bliek was at the apartment, the defendant asked Ms. Price for a ride but directed her not to bring their son. When Ms. Price arrived at the meeting area designated by the defendant, the defendant was driving a gold-colored Jaguar that belonged to the victim. The defendant directed her to follow, drove to a residence located behind a church, and parked the Jaguar. The defendant's clothing was covered with blood. He explained that he had killed the victim's dog.

Upon returning to their apartment, the defendant took a shower and Ms. Price placed the bloody clothing in the washing

machine. The defendant was dressing when Durham and Ms. Bliek returned to the residence. When Durham asked what had happened, the defendant replied that things had not developed as planned. When Durham learned about the defendant's clothes, he retrieved them from the washing machine and placed them in a plastic garbage bag. Durham also suggested that the victim's car be moved because it was left in his neighborhood. The defendant agreed and the two men left. When they returned, they informed Ms. Price that they had taken the Jaguar to Dalton, Georgia. Durham told her that he had disposed of the defendant's clothes along the way. The defendant assured Durham that he had gotten most of the blood off of the car and had removed any fingerprints.

Ms. Price testified that the defendant then informed Durham that he had gone to the victim's residence and struck him on the head with Durham's tire iron; however, the victim merely put his hand on the back of his head and remained conscious. A struggle ensued. When the defendant demanded to know the location of the Jaguar keys and began to search for the keys, the victim attempted to conceal himself in another room of the house. The defendant was unable to find the keys, kicked open the door where the victim was hiding, and stabbed him to death with a knife. The defendant revealed that he then poured lighter fluid on the victim's face and unsuccessfully attempted to burn both the victim and the house. According to Ms. Price, the defendant and Durham returned to the victim's residence on the following day and stole an array of guns, jewelry, and money, including rolled coins.

Staci Price's testimony was largely corroborated by that of Jeannie Bliek. Ms. Bliek testified that on the evening the victim was killed, Ms. Price drove herself to work, leaving her at the apartment with Durham, the defendant, and the Prices' infant son. She recalled that the defendant and Durham began discussing a robbery of the victim. The defendant proposed to obtain money to pay the rent on the apartment, which was overdue. At approximately 8:00 or 9:00 p.m., the defendant and Durham left the apartment, taking a box of latex gloves with them. According to Ms. Bliek, Durham was to drive the defendant to the victim's residence. The defendant and Durham later told Ms. Bliek that Kevin Green had agreed to accompany them, but he "chickened out." Ms. Bliek remembered that at approximately 10:00 or 10:30 p.m., Staci Price returned to the apartment. Only a few minutes later, Durham arrived to take Ms. Bliek to dinner. Ms. Bliek testified that Durham was scheduled to meet the defendant, who would be driving the victim's car, in the parking lot of Goody's at 1:15 a.m. After they ate dinner, Durham dropped off Ms. Bliek at the apartment. At approximately 2:00 a.m., Durham called the apartment, explained that the defendant had failed to appear at Goody's, and asked her assistance in searching for him. The two drove to the victim's house and saw that the lights were on, the garage door was open, and the victim's dog was running in the front yard. The victim's car was not there.

Unable to find the defendant, Durham and Ms. Bliek drove to a pay telephone, called the apartment, and learned that the defendant was at the apartment. When Durham and Ms. Bliek arrived at the apartment, the defendant was wearing the same clothing he had been wearing earlier in the day. Both his clothing and his shoes were bloody. Ms. Bliek observed scratch marks on the defendant, as well as a knife wound on his left arm and a bruise in the center of his chest. While the defendant took a shower, Ms. Price put his

clothing in the washing machine. Before the wash cycle was complete, however, they removed the clothes and placed them in a plastic garbage bag. The defendant and Durham then left to take the victim's car to Dalton, Georgia. When they returned, they informed Ms. Bliek that they had left the stolen car in a motel parking lot with the windows rolled down so that it would be found quickly.

Ms. Bliek recalled that the defendant had initially claimed that the blood on his clothing had come from the victim's dog. After the defendant and Durham returned from Dalton, however, the defendant confessed that he had killed the victim. He revealed that he had gone to the victim's residence and had talked with him for awhile. Later, after having been "caught doing something," the defendant struck the victim over the head with a tire iron. The defendant then asked the victim for his car keys and learned that they were in the kitchen. As the defendant looked for the keys, the victim locked himself in his computer room. Unable to find the keys, the defendant kicked in the door to the computer room, stabbed the victim, and set his face on fire.

Ms. Bliek testified that on the following day, the defendant and Durham returned to the victim's residence to steal guns, jewelry, and money. They also removed things that the defendant might have touched, such as remote controls and a cup. Durham explained to Ms. Bliek that they had used gloves while at the victim's home, but that one of the defendant's gloves had lost a finger. The defendant told her that he had taken money from the victim's front pocket and wallet. Ms. Bliek recalled the defendant telling Durham that the victim had to have been alive when the defendant left on the night before because he found his body against the computer room door. The defendant took

the guns to Durham's brother, who agreed to dispose of them. Ms. Bliek and Durham disposed of other items, such as the remote controls and the cup.

Kevin Green confirmed Jeannie Bliek's testimony regarding his aborted role in the plan to rob the victim. Green testified that the defendant and Durham arrived at his apartment between 9:00 and 10:00 p.m. on the night of the murder. When Durham asked whether he wanted to participate in the robbery, Green initially agreed, but then backed out because he had a "bad feeling." He recalled that the defendant and Durham assured him that they had "no hard feelings." The defendant did ask Green to call his apartment at 12:30 a.m. to make sure that all had gone well. At 12:30, Green telephoned the defendant's apartment and spoke with Staci Price, who informed him that the defendant was not there.

Two days after the murder, when Green asked the defendant whether anything had gone wrong, the defendant responded in the affirmative. The defendant suggested that he watch the news to find out what had happened. That evening, Green videotaped the newscast and took it to the defendant's apartment the next day. Before watching the tape, the defendant repeatedly talked about the victim in the past tense. Ultimately, he said, "Rene's dead, dude." Durham and Ms. Bliek, who had been drinking at a bar, arrived in time to watch the videotape. Durham drew a pistol, waved it towards Green's head, and warned him not to say anything. Neither the defendant nor Durham provided any details of the murder.

Green testified that sometime after police had conducted a search of the defendant's apartment, he and the defendant smoked marijuana together. The defendant explained that "when he went inside, [the victim] saw him and he got caught,

and he just panicked, figured he was busted and said he just snapped." When asked about the murder weapon, the defendant merely stated that it was gone. Later, Green overheard Durham ask the defendant about the knife. The defendant answered that it was in a cemetery, buried under the "I" on a tombstone of one of the defendant's relatives. Green testified that he and Durham went to the cemetery and tried to locate the knife, but were unsuccessful.

Green also recalled that he had been at the victim's residence on two occasions in early 1996. On one of these occasions, he saw the defendant steal three rings. According to Green, the victim had a video camera in his bedroom and caught the theft on tape. Because the tape displayed only the back of the thief, the victim suspected Durham of the crime. When the victim told Durham's wife that he wanted the rings back or else he would press charges, the rings were returned.

Craig Johnson of the Chattanooga Police Department photographed and videotaped the crime scene. He testified that the body was found in the computer room of the residence. The victim was missing a shoe and had a torn shirt with missing buttons. There was blood extending down the wall of the hallway from the computer room into the television room. The victim's eyeglasses, missing shoe, shirt buttons, and watchband were found in the television room. A finger from a latex glove was found on a rug in the kitchen.

Dr. Charles Harlan, who performed the autopsy, concluded that the victim had been stabbed twenty-three times. Multiple stab wounds to the chest had caused his death. Dr. Harlan determined that the victim sustained numerous other injuries both before and after death. It was his opinion that the wounds were inflicted in the following order:

(1) defensive wounds to hands and arms—less than one hour before death;

(2) head wounds (including brain contusion)—five to twenty minutes before death;

(3) chest wounds—within five minutes of death; and

(4) flash burns to face—after death.

At trial, the defendant claimed that on the day of the murder, he took his wife to work at 5:00 or 5:30 in the afternoon, then returned to their apartment. At 7:30 or 8:00 p.m., he left his son with Jeannie Bliek and traveled with Carl Durham to Kevin Green's apartment. He contended that Durham had discovered that the victim was supposed to be out of town and suggested a burglary of his residence. The defendant asserted that Durham asked Green to participate in the theft, but Green declined. After leaving Green's apartment, Durham wanted to drive by the victim's house to determine whether he was at home. When they did so, they observed lights in the house. The defendant claimed that he and Durham then returned to their apartment, arriving at approximately 9:30 p.m.

The defendant testified that he picked up his wife at 10:00 p.m. Afterward, the two deposited some money in the night deposit box, stopped at a Taco Bell, and returned to their apartment by 11:00 p.m. Durham and Ms. Bliek were not at home. The defendant claimed that he then drove to Blockbuster Video to return movies, returned to his apartment, and watched television until bedtime.

According to the defendant, he was later awakened by knocking at the door. When he answered, he found Durham, whom he described as covered in blood. The defendant contended that Durham took a shower, explained that things did not "go right"

at the victim's residence, and asked the defendant to help pick up some things there. The defendant claimed that he and Durham drove to the victim's house between 4:30 and 5:00 a.m. He stated that upon their arrival, Durham informed him that the victim's Jaguar was in the garage and that the keys were on the console. He contended that Durham asked him to follow in the Jaguar and that the two men drove to Dalton, Georgia. The defendant testified that he parked the vehicle in a motel parking lot and left the windows open. The defendant contended that on the return trip, Durham acknowledged that he had "lost his cool" and "gone off." He claimed that Durham warned him not to reveal the circumstances, else he would harm his wife and child.

The defendant testified that when the two men arrived back at their apartment at about 7:00 a.m., he called his employer to report that he would not be at work because he did not have a babysitter for his son. The defendant claimed that later, when Durham asked him to return to the victim's residence, he declined. The defendant explained that he drove to the victim's residence only when Durham again threatened his family. When the two men arrived at about 11:00 a.m. or noon, the defendant acknowledged having found a number of guns in the downstairs of the residence. He admitted loading the weapons into his car. The defendant stated that when he re-entered the house, he walked upstairs and saw blood in the television room. He claimed that at that point, Durham emerged from the victim's bedroom and directed him to kick in the computer room door, whereupon he found the body of the victim. The defendant claimed that Durham acknowledged having killed the victim in a fight after having been discovered during a theft.

Durham, who was tried jointly with the defendant on the same charges, did not testify at trial. He was also found guilty on all counts.

## ISSUES PRESENTED

### I

Initially, the defendant asserts that the trial court erred by allowing his wife to testify notwithstanding the doctrine of spousal privilege. In our view, the trial court correctly denied the defendant's motion to suppress.

In Tennessee, there is no spousal witness privilege:

> In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.

Tenn.Code Ann. § 24–1–201(a). There is, however, a marital communications privilege which may be invoked by either spouse:

> In either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects. . . .

Tenn.Code Ann. § 24–1–201(b). This long recognized privilege is rooted in common law and was created to foster "the sacredness of the home and the peace of families." *McCormick v. State*, 135 Tenn. 218, 186 S.W. 95, 97 (1916).

In determining whether a particular interspousal communication is confidential and subject to the marital communications privilege, the trial court must find all four of the following conditions to exist:

> (1) The communication[ ] must originate in a confidence that [it] will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communication[ ] must be greater than the benefit thereby gained for the correct disposal of litigation.

*Adams v. State*, 563 S.W.2d 804, 808 (Tenn.Crim.App.1978).[1] To be privileged, a communication must be confidential in nature. Where a communication was obviously not intended to be confidential, it is not privileged. *Burton v. State*, 501 S.W.2d 814, 819 (Tenn.Crim.App.1973). For example, the marital privilege does not extend to communications made to, or in the presence of, third parties. *Id.*

Prior to trial, the defendant moved to suppress his wife's testimony on spousal witness privilege and marital communications privilege grounds, contending that Tenn.Code Ann. § 24–1–201, as amended in 1995, had abrogated all existing Tennessee common law on spousal privilege. The trial court determined that Tenn.Code Ann. § 24–1–201 did not completely abrogate Tennessee spousal privilege common law, but modified it to reverse the effect of *State v. Hurley*, 876 S.W.2d 57 (Tenn. 1993). *See State v. Bush*, 942 S.W.2d 489 app. n. 1 (Tenn.1987); *State v. Pat Bondu-*

*rant*, No. 01C01–9606–CC–00236, 1998 WL 120291, p. 60 (Tenn.Crim.App. at Nashville, March 18, 1998), *rev'd on other grounds, State v. Bondurant*, 4 S.W.3d 662 (Tenn.1999). In particular, the trial court ruled that the statute did not abrogate the common law requirement that the four conditions established in *Adams* be met before an interspousal communication will be deemed confidential and, therefore, subject to the marital communications privilege.

The Tennessee General Assembly first addressed spousal privilege in criminal cases in 1915 when it enacted the following statute:

> In all criminal cases, the husband or wife shall be a competent witness to testify for or against each other.

Tenn.Code Ann. § 40–17–104 (repealed 1991).[2] Shortly after the enactment of that statute, our supreme court, when called upon to decide the extent of its effect upon the state's spousal privilege common law, determined that the statute did not abrogate the common law rule that confidential marital communications are privileged and that one spouse may not testify to such communications over the objection of the other. *McCormick*, 186 S.W. at 97. As the common law confidential marital communications privilege evolved over time, the four-prong confidentiality test was developed. *See Adams*, 563 S.W.2d at 808. The law remained

---

**1.** This test, borrowed from Dean Wigmore, is actually applicable not to determine whether a particular communication is privileged, but to determine whether a particular privilege should be recognized. *See* 8 Wigmore, Evidence § 2285 (McNaughton rev.1961) ("... four fundamental conditions are recognized as necessary to the *establishment of a privilege* against the disclosure of communications ...." (emphasis added).). Our supreme court, however, has approved the use of this test to determine whether a specific commu-

nication is privileged. *See State v. Bush*, 942 S.W.2d 489 (Tenn.1997); *State v. Hurley*, 876 S.W.2d 57 (Tenn.1993). Additionally, we note that the Tennessee General Assembly has amended Tenn.Code Ann. § 24–1–201, effective January 1, 2001, to incorporate this test. 2000 Tenn.Pub. Ch. 831.

**2.** This statute was repealed in 1991, subsequent to the adoption of the Tennessee Rules of Evidence.

relatively unchanged until 1993, when our supreme court made a dramatic change in the marital communications privilege by holding that only the witness spouse had the right to exercise the privilege to refuse to testify. *Hurley*, 876 S.W.2d at 64. In consequence, the General Assembly modified Tenn.Code Ann. § 24–1–201, which had previously addressed only civil actions, to its current form.

■ There are several well-established principles which apply to statutory construction. In interpreting the meaning of a statute such as Tenn.Code Ann. § 24–1–201, it is our duty is to ascertain the intent of the General Assembly and carry it out. *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 27 (Tenn.Ct.App. 1991). A statute in derogation of the common law is to be strictly construed. *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593, 599 (Tenn.1999). "[A] statute is to be construed with reference to pre-existing law and it does not change pre-existing law further than it expressly declares or necessarily implies." *Harman v. Moore's Quality Snack Foods, Inc.*, 815 S.W.2d 519, 523 (Tenn.Ct.App.1991); *see also Plough, Inc. v. Premier Pneumatics, Inc.*, 660 S.W.2d 495, 498 (Tenn.Ct.App. 1983). When a term with a well-recognized common law meaning is used in a statute, the term will be given its common law meaning unless a different meaning is apparent from the context or general purpose of the statute. *Lively v. American Zinc Co. of Tenn.*, 137 Tenn. 261, 191 S.W. 975, 977 (1917).

By amending Tenn.Code Ann. § 24–1–201 in 1995 to its present form, the General Assembly gave no indication that it intended to change the common law marital communications privilege beyond changing the rule in *State v. Hurley* and ensuring that the privilege can be invoked by either the testifying or the non-testifying spouse.

From the supreme court's reaffirmation of the common law marital communications privilege in criminal cases in *McCormick v. State*, the privilege remained unchanged by the General Assembly until the decision in *State v. Hurley*. In our view, therefore, the General Assembly intended only to reverse the rule of *Hurley*. The 1995 amendment is consistent with the common law marital communications privilege.

■ In this case, the trial court correctly concluded that the defendant's wife could testify at trial. *See* Tenn.Code Ann. § 24–1–201(a). In our view, none of the testimony offered was barred by the marital communications privilege. Practically all of the conversations occurred in the presence of third parties. Conversations and events under those circumstances are not "confidential" and are not, therefore, protected by the privilege.

At the pretrial hearing on the defendant's motion to suppress, the trial court identified four specific communications to which the defendant and his wife were the only parties: (1) the defendant's telephone call to his wife seeking a ride in the early morning hours of May 29th; (2) a letter written by the defendant while he was in jail awaiting trial, requesting that his wife falsely state that Durham was the one she had seen in bloody clothing; (3) a statement by the defendant that he had buried the murder weapon in a relative's grave; and (4) a statement by the defendant that he used a tire tool from Durham's car to strike the victim. Because the first communication was not intended to be confidential, the trial court ruled that it was not privileged. The remaining three communications were deemed privileged. When, however, the state filed a motion to reconsider, the trial court reversed itself, finding that the relationship between the defendant and his wife was not "one which the community should sedulously foster"

and that "the benefit of the defendant's wife's testimony at trial outweighed the potential damage to the defendant's marriage." *See Adams v. State,* 563 S.W.2d at 808. In our assessment, the evidence does not preponderate against the conclusion of the trial court.

■■■ There is evidence in the record to support a finding that the defendant's call to his wife asking for transportation was not intended to be a confidential marital communication. Initially, the defendant sought transportation from Durham, then from Ms. Bliek, before asking for assistance from his wife. Second, the defendant disposed of the victim's car in a public place. That event could have been witnessed by anyone in the vicinity. When first seen by his wife wearing bloody clothing, the defendant was also on a public street. *See Dowdy v. State,* 194 Tenn. 212, 250 S.W.2d 78 (1952). Neither of those incidents can be described as "originating in a confidence," as is required before the privilege may be invoked. *See Adams v. State,* 563 S.W.2d at 808.

■■■ There is also evidence in the record to support the finding that the potential harm to the defendant's marriage was outweighed by the benefit of his wife's testimony at trial. In December, 1996, nearly a year prior to trial, the defendant's wife had written to the defendant that she wanted a divorce. In March of 1997, she filed for divorce. A hearing was set in February of 1998. Thus, there was evidence that the defendant's marriage was already failing, whether his wife testified at this trial or not. Because there were no eyewitnesses to the murder, the testimony of the defendant's wife offered a significant benefit to the trier of fact, a greater benefit than any injury caused thereby. This rationale is applicable to each of the four communications between the defendant and his wife to which there were no witnesses.

## II

Next, the defendant asserts that the trial court erred by failing to sever his trial from that of his non-testifying codefendant, Carl Durham. The defendant contends that the trial court's failure to sever resulted in a violation of his right of confrontation, made Durham an unavailable witness, and foreclosed his ability to introduce certain evidence.

■■■ The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. *State v. Burton,* 751 S.W.2d 440, 447 (Tenn.Crim.App.1988). Rule 14 of the Tennessee Rules of Criminal Procedure governs severance of defendants and provides in pertinent part as follows:

(c) Severance of Defendants.

(1) If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the State intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

(i) a joint trial at which the statement is not admitted into evidence or at which, if admitted, the statement would not constitute error; or

(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, if, as deleted, the confession will not prejudice the moving defendant; or

(iii) severance of the moving defendant.

(2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:

(i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or

(ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn.R.Crim.P. 14(c). Where a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his codefendant:

The record must demonstrate that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty," before an accused is entitled to a reversal of his conviction.

*Burton,* 751 S.W.2d at 447 (citations omitted).

The defendant first argues that the trial court's denial of his motion for severance resulted in a violation of his Sixth Amendment right of confrontation because he could not cross-examine Durham, who elected not to testify at trial, regarding statements made by Durham in conversations with the defendant. The conversations, which had been recorded, were played for the jury at trial.

The defendant relies upon the ruling in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case, the trial court admitted evidence of the confession of a non-testifying defendant, notwithstanding the fact that the confession also inculpated Bruton, as to whom the statement was inadmissible hearsay. The trial court instructed the jury that the confession was admissible only as to the guilt or innocence of its maker. On appeal, the Supreme Court reversed the conviction, holding that such an instruction was not an acceptable substitute for Bruton's constitutional right of confrontation. *Id.* at 137, 88 S.Ct. 1620.

Durham either recorded or gave permission to the Hamilton County Sheriff's Department to record several conversations between him and the defendant. The three conversations at issue are as follows: (1) a June 6, 1996, telephone conversation between the defendant and Durham, taped by Durham with a standard tape recorder; (2) a June 8, 1996, conversation between the defendant and Durham at Standifer Gap Park, taped by officers through a wire worn by Durham; and (3) a June 12, 1996, telephone conversation between the defendant and Durham, taped by Durham. In these recorded conversations, the defendant and Durham discuss, among other things, how the defendant killed the victim, the status of the investigation, their status as suspects, what the defendant would say to police under questioning, and the disposal of certain evidence.

In our view, this question is controlled not by *Bruton,* but by *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). In *Street,* the state produced a detailed confession by the defendant. The defendant then testified that he had neither burglarized the victim's home nor participated in the murder of the victim. He also claimed that his confession had been coerced and that it was derived from a confession by another participant in the

burglary and murder. In rebuttal, the sheriff read the other participant's confession and explained the differences between the two. Ultimately, the Supreme Court ruled that there had been no Confrontation Clause violation because the other participant's confession had been introduced only to rebut the defendant's claim of coercion and, therefore, was not hearsay:

> The nonhearsay aspect of [the other participant's] confession—not to prove what happened at the murder scene but to prove what happened when responded confessed—raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination was satisfied by [the sheriff's] presence on the stand. If respondent's counsel doubted that [the other participant's] confession was accurately recounted, he was free to cross-examine the [s]heriff. . . .

*Id.* at 414, 105 S.Ct. 2078 (citations omitted); *see also Anderson v. United States,* 417 U.S. 211, 220, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("Here, since the prosecution was not contending that anything the [non-testifying declarants] said at the election contest was true, the other defendants had no interest in cross-examining them. . . ."); *White v. Lewis,* 874 F.2d 599, 603 (9th Cir.1989) ("*Bruton* is inapplicable here because the testimony of which appellant complains is not hearsay."); *United States v. Guerena,* Nos. 97–50052, 97–50178, 1998 WL 187472, at **3 (9th Cir. Apr. 20, 1998) ("The testimony is not hearsay. . . . Its admission does not create a problem under *Bruton.*"); *United States v. Weaver,* 565 F.2d 129, 135 n. 7 (8th Cir. 1977) ("[T]he *Bruton* rule is limited to circumstances where the out-of-court statements are inadmissible hearsay."); *Stevens v. State,* 642 So.2d 828, 829 (Fla. Dist.Ct.App.1994) ("However, the incident complained of could not be a *Bruton* viola-

tion. . . . The officer's testimony concerning Hill's statement here was not hearsay . . . since the testimony was not introduced for its truth, but to show its effect on appellant."); *State v. Daniels,* 92 Ohio App.3d 473, 636 N.E.2d 336, 348 (1993) ("Because these statements were not hearsay . . . [the defendant's] right to confront witnesses was not violated despite the fact that the declarants of these statements did not testify.").

■ At trial, Durham's statements on the tape recordings were not offered by the state to prove the truth of the matters asserted. Rather, they were offered solely for the purpose of providing the context of the defendant's statements. If Durham's comments had been redacted from the tapes, the defendant's statements would have made little sense. Durham's statements were not intended to be substantive evidence. They are not hearsay and their admission did not implicate the defendant's right of confrontation. *See Street,* 471 U.S. at 414, 105 S.Ct. 2078; *State v. Gibson,* 973 S.W.2d 231, 243 (Tenn.Crim.App. 1997) (holding issue of confrontation to be inapplicable to out-of-court statements not offered for truth of matter asserted).

■ The defendant also argues that he was prejudiced by the trial court's refusal to sever because it caused Durham to become an "unavailable witness." While it is unclear whether the defendant directs this argument to the applicability of Tennessee Rule of Evidence 804, which provides certain exceptions to the hearsay rule when the declarant is unavailable, or to his inability to call his codefendant to the stand, either contention is unpersuasive. First, there is no indication that the trial court relied on Tennessee Rule of Evidence 804 by admitting any statements made by Durham. Second, the defendant has failed to

demonstrate any prejudice as a result of his inability to call Durham as a witness.

There is no evidence in this record that Durham would have been willing to testify at a separate trial had a severance been ordered. "It is not an abuse of the trial court's discretion to refuse to sever when the defendant claims that a codefendant would have given exculpatory testimony at a separate trial but the codefendant invoked the [F]ifth [A]mendment at a joint trial." *State v. Ash*, 729 S.W.2d 275, 279 (Tenn.Crim.App.1986); *see also State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn.Crim.App.1982) (finding no prejudice in denial of severance motion where there was no evidence that testimony of codefendants would have been exculpatory in nature).

The defendant asserts that his codefendant waived his Fifth Amendment right against self-incrimination by cooperating with the police in their investigation of the victim's murder; however, he cites no authority for this proposition and apparently did not attempt to call Durham to the stand or otherwise advance this proposition at trial. Thus, the defendant's complaints about the unavailability of Durham at trial are not sufficient to support a finding that the trial court abused its discretion in denying the defendant's motion to sever.

The defendant also argues that the denial of his motion to sever resulted in prejudicial error because he was unable to introduce evidence of Durham's prior criminal history. Based upon the evidence adduced at trial, however, Durham's prior criminal history would have been inadmissible even if the defendant's trial had been severed.

Rule 404 of the Tennessee Rules of Evidence, which governs the admissibility of prior crimes to prove character,[3] provides in pertinent part as follows:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn.R.Evid. 404(b). Generally, this rule is one of exclusion. Evidence of other crimes, wrongs, or acts, however, may be admissible when it is offered on an issue other than character, such as to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. *See State v. Parton*, 694 S.W.2d 299, 302 (Tenn.1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn.1980).

At the time of his trial, Durham had approximately twenty-five prior burglary convictions. Durham was known to leave a "calling card" in the form of a Nike shoe print on the doors of the homes he burglarized. The record does not contain any additional information on Durham's

---

**3.** The defendant cites Tennessee Rule of Evidence 901(b)(4) as a basis for admitting his codefendant's prior criminal history. However, Rule 901, which is addressed to the authentication of documents and other things, is not applicable.

prior criminal history. The defendant's desire to introduce this evidence stems from the fact that one or more shoe prints were found on the outside of the door to the computer room in which the victim had locked himself during the attack. These shoe prints were not made by Durham.

Detective Gary Gaskill testified that the tread design of Durham's shoes did not match that of the shoe prints on the door. Linda Littlejohn, a forensic scientist in the trace evidence section of the Tennessee Bureau of Investigation (TBI) crime laboratory, testified that she found that the tread design of the defendant's shoes, which had been seized by Detective Gaskill pursuant to a search warrant, was an exact match to the tread design of the shoe prints on the victim's door. The defendant acknowledged that he had kicked in the door of the computer room. Under these circumstances, the defendant's request to introduce Durham's prior criminal history should have been denied. While the identity of the victim's attacker was an issue in the trial, Durham's criminal history and his pattern of leaving shoe prints at crime scenes could hardly be relevant where the evidence excludes Durham as the maker of the shoe prints found at the crime scene.

Accordingly, the trial court did not abuse its discretion by denying the defendant's motion to sever.

### III

In a related issue, the defendant claims that the trial court erred by admitting into evidence the tape recordings of his conversations with Durham. The defendant asserts that the tapes should have been excluded because they contain statements obtained in violation of his Sixth Amendment right to counsel, because Durham's statements constituted hearsay not subject to any exception, and because their admission amounted to a violation of his Sixth Amendment right of confrontation. Because we have already addressed the right of confrontation argument raised by the defendant with regard to the tapes, we will not revisit that argument here.

■ The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend VI. A defendant has the right to counsel at all " 'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' " *Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (*quoting United States v. Wade*, 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

The United States Supreme Court has long held that "the [Sixth Amendment] right to counsel attaches only at or after the initiation of adversary proceedings against the defendant ... 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States v. Gouveia*, 467 U.S. 180, 187–88, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). That interpretation comports with the underlying purposes of the Sixth Amendment:

> That interpretation of the Sixth Amendment right to counsel is consistent not only with the literal language of the Amendment, which requires the existence of both a "criminal prosecutio[n]" and an "accused," but also with the purposes which we have recognized that the right to counsel serves. We have recognized that the "core purpose" of the counsel guarantee is to assure aid at trial, "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor."

\* \* \*

Although we have extended an accused's right to counsel to certain "critical" pretrial proceedings, we have done so recognizing that at those proceedings, "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both, in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality."

*Id.* at 188–89, 104 S.Ct. 2292 (citations omitted). In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant is issued, or an indictment or presentment, when the charge is initiated by the grand jury, marks the initiation of criminal charges to which the Sixth Amendment right to counsel attaches. *State v. Mitchell,* 593 S.W.2d 280, 286 (Tenn.1980).

The defendant had no Sixth Amendment right to counsel at the time that he and Durham had the tape recorded conversations. The defendant had been fingerprinted and released by the police, but had not been charged with any offense. The defendant maintains that the issuance of a search warrant for his apartment was sufficient to trigger his Sixth Amendment right to counsel. He cites no authority for that proposition, however, and this court has found none in support of this claim.

With regard to the defendant's hearsay claim, the defendant appears to concede that his own statements are party admissions that are not excluded by the hearsay rule. *See* Tenn.R.Evid. 803(1.2). He argues, however, that Durham's statements were inadmissible hearsay and should have been redacted from the recordings. The trial court determined that Durham's statements were admissible under the co-conspirator exception to the hearsay rule and admitted the recordings in their entirety. In our view, the recordings were properly admitted. Because Durham's statements are not hearsay, it is unnecessary to address the co-conspirator exception.

The Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn.R.Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn.R.Evid. 801(c). If an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay. *See State v. Howell,* 868 S.W.2d 238, 252 (Tenn.1993). "If the declarant's credibility is irrelevant because it does not matter whether the declarant is telling the truth, the dangers of hearsay are not present and the statement is not viewed as hearsay." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 801.3, at 495 (3d ed.1995).

In *State v. Jones,* 598 S.W.2d 209 (Tenn. 1980), the defendant was convicted of solicitation to commit robbery, notwithstanding his assertion of the entrapment defense. At trial, the state introduced several tape recorded conversations between the defendant and an undercover agent with the federal Bureau of Alcohol, Tobacco & Firearms. On appeal, our supreme court held that the tape recordings were nonhearsay:

> We first look to so much of the taped conversations as relates to questions and answers by [the undercover agent]. These are not hearsay because her remarks were not offered or intended as substantive evidence designed to prove the truth of the matter asserted therein and there was no requirement or need arising from the

offer of her statements that they be taken as true. Indeed, many of the statements made by her were admittedly false and the State neither asked nor wanted the jury to believe her. These statements must be tested solely by the State's primary objective of bringing before the jury the statements and declarations made by the petitioner. . . .

*Id.* at 223.

The rulings in *Jones* and *State v. Gibson*, 973 S.W.2d 231 (Tenn.Crim.App.1997), are controlling on this issue. In *Gibson*, the defendant was convicted of four counts of rape of a child. On appeal, he challenged the trial court's admission of two audio tapes containing conversations between him and his wife wherein he admitted sexual contact with the victim. The conversations had been recorded by his wife in conjunction with the Tennessee Bureau of Investigation. The defendant argued, among other things, that his wife's statements were inadmissible hearsay. This court, however, upheld the admission of the tapes:

> Brenda Gibson's statements on the tapes were not hearsay because her statements were not offered for the truth of the matter asserted. Her statements were not offered or intended to be substantive evidence. The purpose of her comments was to elicit statements from the defendant. As in *Jones*, the state did not ask the jury to believe what she said on the tapes. The state's primary objective was to bring before the jury the statements made by the defendant.

*Id.* at 243 (citations omitted).

As indicated in conjunction with our discussion of the defendant's claim that he was entitled to a severance of his trial from Durham's, we find that Durham's statements on the tape recordings were not hearsay. The statements, which were made by Durham to elicit comments from the defendant, were not offered by the state as substantive evidence. Moreover, when the defendant took the stand and attempted to explain his statements on the tapes, he implicitly admitted the authenticity and accuracy of the recordings. As such, the trial court properly admitted the recordings, and it was the jury's prerogative to discredit the defendant's proffered explanation.

## IV

The defendant next contends that the trial court erred by admitting evidence pertaining to his tennis shoes, which were seized by authorities pursuant to a search warrant obtained by Detective Gary Gaskill. The defendant contends that because he did not receive a copy of the affidavit in support of the search warrant, as required by Rule 41 of the Tennessee Rules of Criminal Procedure, the evidence must be excluded. Because the defendant failed to raise this issue in his motion for new trial, it is waived. *See* Tenn.R.App.P. 3(e), 36(a). Nonetheless, we find that the evidence was properly admitted.

A search warrant may only issue upon a sworn affidavit establishing the grounds for its issuance. Tenn.R.Crim.P. 41(c). Once the warrant is executed, a copy thereof must be delivered to the person on whom it is served:

> The magistrate shall prepare an original and two exact copies of the search warrant, one of which shall be kept by the magistrate as a part of his or her official records, and one of which shall be left with the person or persons on whom the search warrant is served. . . . Failure of the magistrate to make said original and two copies of the search warrant . . . or the fail-

ure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

Tenn.R.Crim.P. 41(c). The affidavit upon which the warrant was issued is not considered part of the search warrant, even if the affidavit and the warrant are on the same preprinted form. *Minton v. State,* 186 Tenn. 541, 212 S.W.2d 373, 374 (1948); *State v. Smith,* 836 S.W.2d 137, 141 (Tenn. Crim.App.1992); *see also Hampton v. State,* 148 Tenn. 155, 252 S.W. 1007, 1009 (1923). As such, "[t]here is no statutory law or rule mandating that a signed, exact copy of the supporting affidavit must also be served with the warrant." *State v. Lowe,* 949 S.W.2d 300, 303 (Tenn.Crim. App.1996).

 In our view, the trial court properly admitted evidence relating to the defendant's tennis shoes. Because there was no requirement that Detective Gaskill's affidavit in support of the search warrant be delivered, the seizure was not illegal.

In *State v. Lowe,* the defendant sought to suppress evidence obtained pursuant to a search warrant because the affidavit in support of the warrant was unsigned. The trial court denied the defendant's request. On appeal, this court affirmed, citing the fact that the warrant did not make reference to the affidavit:

> Upon examination of both the warrant and the affidavit, there is no reference to the other in either document. The warrant could have been singularly served upon the Defendant, and a legal search conducted, without the Defendant having seen the contents of the affidavit. In sum, the presumption is that an affidavit is not part of a search warrant, even if the two docu-

ments are served together, or are both found on the same sheet of paper. If, however, there is explicit reference to the affidavit in the search warrant, the affidavit may be considered part of the warrant.

*Lowe,* 949 S.W.2d at 304.

The record here reflects that the search warrant contained the following reference to Detective Gaskill's affidavit:

> Proof having been made before me and reduced to writing and sworn to by Detective Gary Gaskill, Hamilton County Sheriff's Office, whose affidavit is attached hereto....

Significantly, the warrant does not incorporate the affidavit by reference or rely on the affidavit to supply any of its essential elements. In other words, "[t]he warrant could have been singularly served upon the [d]efendant, and a legal search conducted, without the [d]efendant having seen the contents of the affidavit." *Id.*

V

Next, the defendant contends that the trial court erred by allowing the state to introduce evidence of DNA testing conducted on the blood samples found in the victim's Jaguar automobile. Specifically, the defendant asserts that because neither he nor the victim could be excluded as a donor of the samples, and because no statistical evaluation of the samples could be completed, evidence of the DNA testing was irrelevant. The defendant further asserts that the DNA results should have been excluded because their probative value was outweighed by their prejudicial effect.

 All evidence, including expert testimony, must be relevant. Tenn.R.Evid. 402. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. Relevant evidence may be excluded if its probative value is "substantially outweighed" by the danger of unfair prejudice. Tenn. R.Evid. 403.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn.1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn.R.Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn.R.Evid. 703.

■ Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993).

■ In addition, Tennessee has a statute which specifically addresses the admissibility of DNA evidence:

> (a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.

> (b)(1) In any civil or criminal trial, hearing or proceeding, the results of DNA analysis, as defined in subsection (a), are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence.

> (2) Nothing in this section shall be construed as prohibiting any party in a civil or criminal trial from offering proof that DNA analysis does not provide a trustworthy and reliable method of identifying characteristics in an individual's genetic material, nor shall it prohibit a party from cross-examining the other party's expert as to the lack of trustworthiness and reliability of such analysis.

> (c) In any civil or criminal trial, hearing or proceeding, statistical population frequency evidence, based on genetic or blood test results, is admissible in evidence to demonstrate the fraction of the population that would have the same combination of genetic markers as was found in a specific biological specimen. For purposes of this subsection, "genetic marker" means the various blood

types or DNA types that an individual may possess.

Tenn.Code Ann. § 24–7–117. This statute effectively exempts DNA evidence from the reliability and trustworthiness inquiry required by Rule 703. *State v. Begley,* 956 S.W.2d 471, 477 (Tenn.1997).

 Here, the trial court properly admitted the results of the TBI's DNA testing on the blood samples obtained from the victim's automobile. Samera Zavaro, a special agent employed in the serology section of the crime laboratory, testified that she had found several small samples of blood in the vehicle. Because of the small quantity of blood involved, she combined the samples and conducted a polymerase chain reaction (PCR) DNA analysis of the conglomerate sample. Ms. Zavaro determined that the blood sample contained DNA donated by two or more human beings. She was able to exclude Carl Durham as a possible donor but could not exclude either the defendant or the victim.

Because the identity of the perpetrator was an important issue at trial, evidence of DNA testing performed on the blood samples was relevant. The DNA testing evidence "substantially assisted" the trier of fact. *See* Tenn.R.Evid. 702. Although the testing excluded neither the defendant nor the victim, it did conclusively exclude Durham. Because the defense theory was that Durham attacked and killed the victim, the DNA evidence was particularly helpful in the determination of the facts.

 Finally, the defendant asserts that the DNA testing evidence should have been excluded because its probative value was outweighed by the danger of unfair prejudice. *See* Tenn.R.Evid. 403. As indicated, this evidence was highly probative. Of equal importance is that the defendant has failed to demonstrate how he was unfairly prejudiced. That the defendant could not be excluded as a donor of the blood in the victim's vehicle was not "unfair." Thus there is no merit to the defendant's claim.

## VI

The next issue is whether the trial court erred by initiating voir dire prior to the distribution of a prospective juror list to counsel. *See* Tenn.R.Crim.P. 24(g). Because the defendant was not prejudiced by the delay, there was no error.

 The defendant is entitled to a prospective juror list, including limited personal information about the jurors, prior to trial:

Upon request, the parties shall be furnished with a list of members of the jury panel, containing the following information with respect to each: name, address, occupation, name of spouse, occupation of spouse. The list shall also state whether each prospective juror has previously served on a criminal court jury; however, that information need not be provided prior to the day of trial.

Tenn.R.Crim.P. 24(g). The purpose of this rule is to "make voir dire more efficient by providing basic information before counsel questions individual jurors." *State v. Lynn,* 924 S.W.2d 892, 897 (Tenn.1996). Any failure to furnish the list to trial counsel is not a basis for reversal unless the defendant establishes prejudice. *State v. Harris,* 839 S.W.2d 54, 66 (Tenn.1992); *State v. Cameron,* 909 S.W.2d 836, 849 (Tenn.Crim.App.1995).

 The record does not establish when or if defense counsel requested a Rule 24(g) juror list. The only reference to the list by defense counsel is as follows:

THE COURT: I see, yes. Anything else?

MR. POPE: We're just waiting for a jury list. She says it's not ready yet.

THE COURT: Well, we'll go ahead and get started on it. We'll put them in the box, do all we can.

Nor does the record establish when defense counsel ultimately received the list. The defendant's brief, which asserts that the list was not provided "until over one hour into jury selection," is the only reference to the timing of the list's distribution.

▮▮▮▮▮ Initially, defense counsel did not make a contemporaneous objection to beginning voir dire without a juror list. Moreover, the defendant has failed to establish how he was prejudiced by the untimely provision of a juror list. That is, during voir dire, defense counsel was not prevented from acquiring information that would normally be included in a Rule 24(g) juror list. Nor did the state gain any sort of advantage by a late distribution of the list. Finally, information contained in the parties' briefs is not a part of the appellate record. *See, e.g., State v. Matthews,* 805 S.W.2d 776, 783–84 (Tenn.Crim.App.1990). Because it is the duty of the appellant to supply an adequate record for a determination on the merits, the defendant could not be granted relief. *See State v. Coolidge,* 915 S.W.2d 820, 826 (Tenn.Crim.App. 1995).

▮▮▮▮▮ As a collateral issue, the defendant asserts that the trial court erred by not ordering individual voir dire of the prospective jurors. Because the claim was not presented in a motion for new trial, the defendant has waived the issue. *See* Tenn. R.App.P. 3(e), 36(a). Nevertheless, we find no error in the method by which the trial court conducted voir dire. Rule 24 grants trial courts the authority to permit individual voir dire:

The court, upon motion of a party or on its own motion, may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

Tenn.R.Crim.P. 24(a). Generally, the trial judge has the discretion to control voir dire, including any determination as to whether prospective jurors should be individually questioned. *State v. Oody,* 823 S.W.2d 554, 563 (Tenn.Crim.App.1991); *see also State v. Jefferson,* 529 S.W.2d 674, 682 (Tenn.1975). The prevailing practice in this state is to examine the jurors collectively rather than individually. *Oody* at 563; *Bouchard v. State,* 554 S.W.2d 654, 659 (Tenn.Crim.App.1977). Individual voir dire is mandated only when there is a significant possibility that a prospective juror has been exposed to potentially prejudicial material. *State v. Claybrook,* 736 S.W.2d 95 (Tenn.1987); *Sommerville v. State,* 521 S.W.2d 792, 797 (Tenn.1975).

▮▮▮▮▮ Here, the defendant sought individual voir dire of the prospective jurors after the trial court had completed its initial questioning. As grounds for the request, defense counsel cited a concern that the panel might become contaminated as the state and the defense questioned individual jurors about their knowledge of the facts. The trial court denied the request on the ground that those jurors who had any recollection of the incident had already revealed that they recalled only generalities:

THE COURT: I don't see anything at this point to indicate that there's any reason—the two that indicated they read the morning papers had not discussed it and I didn't ask what they read and I did excuse them. I haven't asked these others if they read anything about it, the new ones in the box, but I see nothing from any of those other jurors. They indicated that they just remembered it in gen-

eralities, and they could put anything aside, and it would not affect their verdict at all

. . . .

In our view, the trial court did not abuse its discretion by denying the request for individual voir dire of the prospective jurors. The trial court considered the potential for contamination of the panel before determining that the risk was minimal. While the defendant claims that his "ability to select a fair and impartial jury was prejudiced," he does not explain how. Nor does he cite any portions of the record which would suggest any contamination.

## VII

The defendant next asserts that the trial court erred by allowing the state to refresh the recollection of two of its witnesses, Jeanie Bliek and Kevin Green, by using statements they had provided to investigating officers. The defendant also asserts that the trial court erred by allowing the state to ask leading questions of these two witnesses absent any showing of hostility. It is the state's position that use of the statements was appropriate and that any error would have been harmless.

Rule 612 of our Rules of Evidence, which governs the use of writings to refresh a testifying witness's memory, provides as follows:

> If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and

order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

Tenn.R.Evid. 612. The proper procedure for refreshing the memory of a witness is included in the Advisory Commission Comments on the rule:

> Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn.R.Evid. 612, Advisory Commission Comments.

■ Initially, the defendant contends that the trial court should not have allowed the state to refresh the recollections of witnesses Bliek and Green with transcripts of their recorded statements because the statements were not "writings" within the meaning of Rule 612.

■ In our view, Rule 612 does not limit the type of writing that may be used to refresh a testifying witness's recollection:

> Rule 612 applies to a "writing." *It does not prescribe who must author the writing or the source of the writing. Rule 612 applies to any writing used to refresh a witness's memory, irrespective of who prepared the writ-*

*ing, when it was prepared, or whether the witness had ever seen the writing until the moment of testimony.* The writing used to refresh memory need not be admissible and the best evidence rule, Rule 1002, is inapplicable.

Neil P. Cohen, et al., *Tennessee Law of Evidence* § 612.2, at 402 (3d ed.1995) (emphasis added). Furthermore, this court has implicitly sanctioned the use of transcribed tape recorded conversations for purposes of refreshing recollection. *See State v. Elrod,* 721 S.W.2d 820, 822–23 (Tenn.Crim.App.1986).

■■■ Secondly, the defendant complains that Bliek and Green were improperly allowed to retain the transcripts of their recorded statements while they were testifying. The Advisory Commission Comments to Rule 612 are specific as to the appropriate procedure: The examining attorney hands the witness the writing to be reviewed, retrieves the writing once the witness has reviewed it, and then allows the witness to testify from her refreshed recollection. *See also* Cohen, *supra,* § 612.3 (Supp.1999). Here, however, the error was harmless. There is no indication that the witnesses ever read from the transcripts or otherwise exceeded the boundaries of refreshing their recollections. *See State v. Dishman,* 915 S.W.2d 458 (Tenn.Crim.App.1995) (holding that failure to take back police logs used to refresh recollection of testifying officer was harmless error).

■■■ Prior to using a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must show that the witness's memory requires refreshing and that the writing will be useful in that regard. *See* Tenn.R.Evid. 612, Advisory Commission Comments; *State v. Mathis,* 969 S.W.2d 418, 421 (Tenn.Crim.App.1997) ("At the point [the witness] was shown the statement, it had

not been established that his memory needed refreshing. Accordingly, the evidence at the time of its admission did not qualify under Rule 612."). During the direct examination of witness Bliek the state directed her to look at the transcript of her recorded statement on three separate occasions without first establishing that she was having difficulty recalling the events about which she was being questioned:

Q All right. Did he tell you how Eric was supposed to get to Goody's at 1:15?

A No, he didn't say.

Q All right. I want [you to] look a page 5 of your statement.

* * *

Q Did they say anything—did they say anything at that time about the condition of the car?

A It was the same.

Q All right. Would you look at page 18 of your statement.

* * *

Q I didn't mean did they tear it up. Did they say anything about the car?

A They said that there was blood in it.

Q All right. Anything else?

A No.

Q Again, look at page 18 of your statement.

There were similar incidents during the questioning of witness Green.

■■■ It was error for the trial court to allow the state to examine witnesses Bliek and Green in this manner. The trial court should have required the state to establish a proper foundation before allowing the witnesses to refresh their recollections with the written documents. It is apparent, however, that the error did not affect

the results of the trial. In consequence a new trial would not be warranted on this ground. *See* Tenn.R.App.P. 36(b).

▪ Finally, the defendant asserts that the trial court erred by allowing the state to lead these two witnesses during their direct examinations. *See* Rule 611(c). During the trial, the defendant objected numerous times to the state's directing the witnesses to specific portions of their statements. The statements were lengthy, however, and the method used ultimately saved time. The defendant made four objections to leading during the direct examination of witness Bliek and one during the direct examination of witness Green. Two of the objections made during Bliek's testimony were sustained. The others were overruled. None of the answers supplied when the objections were overruled resulted in testimony prejudicial to the defendant. In summary, the trial court did not commit reversible error during the testimony of these two witnesses.

### VIII

The defendant next asserts that the trial court should not have allowed the state to introduce photographs of the body taken both at the crime scene and during the autopsy. He argues that the probative value was outweighed by the danger of unfair prejudice. *See* Tenn.R.Evid. 403.

▪ The admissibility of photographs is discretionary with the trial court. A ruling will not be disturbed on appeal absent a clear abuse of discretion. *State v. Zirkle,* 910 S.W.2d 874, 888 (Tenn.Crim. App.1995). In order to be admissible, photographs must be relevant, and their probative value must not substantially outweigh any danger of unfair prejudice. Tenn.R.Evid. 403; *State v. Banks,* 564 S.W.2d 947, 950–51 (Tenn.1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision

on an improper basis, commonly, though not necessarily, an emotional one." *Banks,* 564 S.W.2d at 951. Autopsy photos should be particularly scrutinized because "they present an even more horrifying sight and show the body in an altered condition." *Id.*

In *State v. Collins,* 986 S.W.2d 13 (Tenn. Crim.App.1998), the defendant asserted on appeal that the trial court erred by admitting a number of color photographs of the infant victim. In determining that the trial court had erroneously admitted the photographs, this court stressed that the ultimate consideration with regard to their admissibility was one of fairness:

> Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. If other considerations substantially outweigh the probative value of the evidence, it should be excluded. In *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978), our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim. . . ." In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors.
>
> The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." One authority characterizes evidence that is unfairly prejudicial as that designed to appeal to the sympathy, sense of horror, or instinct to punish.

The issue, in our view, is one of simple fairness. Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." Murder is an absolutely reprehensible crime. Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.

*Id.* at 19–20 (citations omitted).

In this case, the trial court allowed twenty-two of the thirty-four photographs of the body proffered by the state. Specifically, the trial court allowed the state to introduce the following photographs:

Exhibit 2—Depiction of victim's body at crime scene;

Exhibit 4—Depiction of room in which victim's body was found, including victim's legs and feet, which were not injured during the attack;

Exhibit 8—Close-up depiction of victim's chest wounds, taken at crime scene;

Exhibit 9—Close-up depiction of wounds on victim's left hand, taken at crime scene;

Exhibit 10—Close-up depiction of wound on victim's left forearm, taken at crime scene;

Exhibit 11—Close-up depiction of wounds on victim's right hand, taken at crime scene;

Exhibit 13—Close-up depiction of wounds on victim's right forearm, taken by medical examiner;

Exhibit 14—Close-up depiction of wounds to victim's torso, taken by medical examiner;

Exhibit 16—Close-up depiction of wound on victim's back, taken by medical examiner;

Exhibits 17—21—Close-up depictions of wounds on palms and backs of victim's hands, taken by medical examiner;

Exhibit 22—Close-up depiction of sole of victim's left shoe, taken by medical examiner;

Exhibit 23—Close-up depiction of flash burn on victim's face, taken by medical examiner;

Exhibit 24—Depiction of wounds on victim's torso and head, taken by medical examiner;

Exhibit 25—Close-up depiction of wounds to top of victim's head, taken by medical examiner;

Exhibit 27—Close-up depiction of wounds on victim's left forearm, taken by medical examiner;

Exhibit 28—Depiction of wounds on victim's right forearm, including view of victim's chest, taken by medical examiner;

Exhibit 32—Close-up depiction of wound on victim's back, taken by medical examiner; and

Exhibit 34—Close-up depiction of wound on victim's back, taken by medical examiner.

The trial court excluded those crime scene photos that would have been duplicative of Exhibit 2 and those that showed the face of the victim. The trial court also excluded those medical examiner photos that were deemed to be duplicative and, again, those exhibiting the face of the victim. A photograph of the victim in a semi-fetal position was also excluded.

In our view, the number of photographs of the body could have and should have been reduced. Notwithstanding the trial court's attempt to avoid dupli-

cation, a number of the photographs admitted were duplicative of others. In the context of the entire trial, however, any error was harmless. The photographs were relevant because the state had to prove intent and premeditation, elements which may be inferred from the brutality of the attack on the victim. *Banks,* 564 S.W.2d at 950. Because the photographs demonstrated the manner and extent of the attack on the victim, they had a direct bearing on the elements of intent and premeditation. Furthermore, the medical examiner used the photos to illustrate his testimony, rather than describing in detail each of the twenty-three stab wounds sustained by the victim.

■ The probative value of the photographs was not substantially outweighed by the danger of unfair prejudice to the defendant. Prior to trial, there was a hearing on the admissibility of the photos. The trial court individually scrutinized each photograph offered by the state. Exhibits 23 and 24 are the only photographs showing the face of the victim. Because the body had been washed by the medical examiner and the eyes and mouth were shut, the photos were not particularly gruesome. A number of crime scene photos which showed the entire body of the victim were excluded. The trial court allowed only one to be admitted. Exhibit 2, perhaps the most gruesome of the crime scene photographs admitted by the trial court, is mitigated somewhat by the fact that the victim's face is turned away from the camera.

The autopsy photographs are unpleasant because they show wounds to an elderly victim; but they are not unusually gory. The majority of the photos were taken after the body was washed. Each photo appears to have been taken prior to the initiation of any internal examination. Exhibit 23 shows the flash burns to the face,

yet other head wounds are covered by bandaging. In summary, while the number of photographs admitted should have been reduced, any error committed by the excess was harmless in view of the overwhelming evidence of the defendant's guilt.

■ The defendant further argues that the prejudicial nature of the photographs was exacerbated by the manner in which they were shown to the jury. The photographs were passed to the jury, shown on a television monitor, and then displayed by the state during closing argument. There is, however, no indication in the record of how the photographs were used, either during the testimony of the state's witnesses or during the state's closing argument. "It is the duty of the defendant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the bases of the appeal." *State v. Coolidge,* 915 S.W.2d 820, 826 (Tenn.Crim.App.1995). In the absence of a sufficient record, this court must presume that the trial court did not abuse its discretion with regard to the manner in which it allowed the state to use the photographs of the victim's body once they were admitted.

■ Finally, the defendant asserts that the trial court erred by admitting a videotape of the crime scene. The admissibility of the videotape is governed by the same standards applicable to the admissibility of the photographs of the victim's body. *See State v. Cauthern,* 967 S.W.2d 726 (Tenn. 1998). In our view, the potential for prejudice does not outweigh the probative value. The body is shown only briefly on the tape and only from a distance. The videotape does not include any close-ups of the body. The trial court did not err.

## IX

Next, the defendant contends that the trial court erred by failing to enter a judgment of acquittal on the charge of conspiracy to commit aggravated robbery. He claims that the evidence did not establish that he and the codefendant knew that the victim would be at home on the evening of the murder. Rule 29 of the Tennessee Rules of Criminal Procedure provides the basis for a motion for judgment of acquittal:

> Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right.

Tenn.R.Crim.P. 29(a). This rule empowers the trial court to enter a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. When a motion for judgment of acquittal is made, the trial court must favor the state with the strongest legitimate view of the evidence, including all reasonable inferences to be drawn therefrom, and discard any countervailing evidence. *Hill v. State*, 4 Tenn.Crim.App. 325, 470 S.W.2d 853 (1971).

The standard by which the trial court is to determine a motion for judgment of acquittal is, in essence, the same standard applicable on appeal when this court is called upon to determine the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim.App.1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn.Crim.App.1994). A jury verdict, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and any reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978).

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim.App.1978). This court may neither reevaluate the evidence nor substitute its inferences for those drawn by the jury. *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim.App.1978). A conviction may be set aside only when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R.App.P. 13(e).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn.Code Ann. § 39–13–401(a). A robbery becomes aggravated under the following circumstances:

> (a) Aggravated robbery is robbery as defined in § 39–13–401:

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or

(2) Where the victim suffers serious bodily injury.

Tenn.Code Ann. § 39–13–402(a). Conspiracy to commit an offense, including aggravated robbery, occurs where "two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn.Code Ann. § 39–12–103(a).

■ In our view, the evidence presented was sufficient to support a finding beyond a reasonable doubt by a rational trier of fact that the defendant was guilty of conspiracy to commit aggravated robbery. Jeannie Bliek testified that both the defendant and the codefendant admitted calling the victim from a pay phone prior to the commission of the crime in order to determine whether he was home. Moreover, the defendant testified that he and the codefendant had seen lights when they drove by the victim's house at approximately 8:30 or 9:00 p.m. on the evening of the murder. The defendant's possession of a tire iron when he entered the residence implies that he anticipated a confrontation. Nothing in the record suggests that the tire iron was ever intended to be used for any purpose other than a possible assault. Finally, Staci Price testified that a day or two prior to the murder, as well as on other prior occasions, she overheard the defendant and the codefendant discussing "robbing" the victim.

In summary, the record supports the trial court's denial of the defendant's motions for judgments of acquittal.

X

The defendant next argues that the trial court erred by ordering that his aggravated robbery sentence be served consecutively to his first degree murder sentence. The defendant claims that the trial court should not have used Tenn.Code Ann. § 40–35–115(4) as grounds for consecutive sentencing because the jury used a similar enhancement factor, Tenn.Code Ann. § 40–35–114(10), in determining his murder sentence of life without the possibility of parole. The defendant also asserts that his aggravated robbery and conspiracy sentences should have been merged into his murder sentence.

■ When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991); *see State v. Jones*, 883 S.W.2d 597 (Tenn.1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40–35–102, –103, –210; *State*

*v. Smith,* 735 S.W.2d 859, 863 (Tenn.Crim. App.1987).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in *Gray v. State,* 538 S.W.2d 391, 393 (Tenn.1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in *State v. Taylor,* 739 S.W.2d 227 (Tenn.1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed ... and ... the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

*Id.* at 230. The Sentencing Commission Comments adopted this cautionary language. Tenn.Code Ann. § 40–35–115. The 1989 Act is, in essence, the codification of the holdings in *Gray* and *Taylor;* consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[4] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation

prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation;
>
> (7) The defendant is sentenced for criminal contempt.

Tenn.Code Ann. § 40–35–115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn.Code Ann. § 40–35–102(1), and "no greater than that deserved" under the circumstances, Tenn.Code Ann. § 40–35–103(2); *State v. Lane,* 3 S.W.3d 456 (Tenn.1999).

In *Gray,* our supreme court ruled that before consecutive sentencing could be imposed upon a dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circum-

---

4. The first four criteria are found in *Gray.* A fifth category in *Gray,* based on a specific number of prior felony convictions, may en-
hance the sentence range but is no longer a listed criterion. *See* Tenn.Code Ann. § 40–35–115, Sentencing Commission Comments.

stances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn.1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[ ] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The *Wilkerson* decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in *State v. Woods*, 814 S.W.2d 378, 380 (Tenn.Crim. App.1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." *Wilkerson*, 905 S.W.2d at 938.

■ The record here demonstrates that the trial court considered the applicable sentencing principles and took into account all relevant facts and circumstances in establishing the aggravated robbery sentence. In determining the length of the sentence, the trial court found and applied two enhancement factors, Tenn. Code Ann. § 40–35–114(5) (that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense) and Tenn.Code Ann. § 40–35–114(6) (that the personal injuries inflicted upon the victim were particularly great). Based upon the application of those factors, the trial court began with a twelve-year sentence, the maximum allowable for a Range I standard offender. The trial court then applied two mitigating factors: that the defendant had no prior criminal record and that the defendant came from a strong family and church background. *See* Tenn.Code Ann. § 40–35–113(13). Based on those factors, the

sentence was adjusted downwards to ten years.

The trial court also determined that the defendant was a dangerous offender within the meaning of Tenn.Code Ann. § 40–35–115(4). As required by *Wilkerson*, the trial court concluded that consecutive sentencing was warranted by the severity of the offense and was necessary to protect the public from the defendant:

What I'm basing [the consecutive sentencing] on is the facts of the case before me, the facts of the murder case, the facts of—of course, there's the aggravated robbery case, to the facts of the aggravated robbery case which was a totally unnecessary, cold-hearted, callous total lack of feeling or sensitivity toward another human being.

I think a case like this and particularly ... with the way [the victim] was treated ... shows a total inhumanity to man and depravity of the soul and I think all those things go into my consideration and the fact that the law says very specifically that the defendant is a dangerous offender, I think all those things that I mentioned go in to show that he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. It's for that reason and that reason alone that I'm ordering the sentence consecutive.

\* \* \*

I look at [the defendant] and I see this relatively young, clean-cut man and I think ... why? ... And it tears me apart ... to have to look at this man and sentence him to this kind of sentence. I'd rather not do it. I'd rather not do it and I feel sorry for his family.

\* \* \*

I don't know if those magic words were said, but I think based on my definition of dangerous offender and my indication that the type of behavior indicates little or no regard to human life and no hesitation about committing a crime to which [the danger to] human life was high I think—certainly that would be implicit in those statements that for the protection of society that that would be ordered, but for the record those words are there.

■ Because the trial court appropriately considered the applicable sentencing principles with regard to the defendant's aggravated robbery sentence, the trial court's order that that sentence be served consecutively to the defendant's murder sentence is entitled to a presumption of correctness. The burden is on the defendant to rebut that presumption.

The defendant asserts that the trial court should not have relied on the dangerous offender classification in ordering a consecutive sentence because the jury had already considered that factor in determining the defendant's sentence of life without the possibility of parole. He also contends that the trial court should have merged the aggravated robbery and conspiracy sentences with the murder sentence. We find neither of these arguments persuasive.

Initially, we note that the jury did not consider the defendant's status as a dangerous offender in determining the murder sentence. To the contrary, the aggravating circumstances instructed by the trial court included only the following: (1) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or

another; (3) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery; and (4) the defendant knowingly mutilated the body of the victim after death. *See* Tenn.Code Ann. § 39–13–204(i)(5)—(7), (13). None of those aggravating circumstances resembled the dangerous offender criterion relied upon by the trial court in ordering consecutive sentencing.

■ The defendant also asserts that the trial court should not have ordered his aggravated robbery sentence to be served consecutively because he had no prior criminal record and because life without parole was sufficient to protect society. In our view, the record supports the conclusion that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn.Code Ann. § 40–35–115(b)(4). There is evidence that the defendant and others with whom he associated had obtained money and gifts from the victim simply by asking. Apparently, the victim was generous to the defendant. Nevertheless, the defendant attacked and killed the elderly victim for an insubstantial sum of money and a few guns. Although the defendant had no prior criminal record, his attack on the victim was exceedingly brutal.

Furthermore, the record demonstrates that consecutive sentencing is necessary to protect the public from the defendant. The defendant has neither acknowledged his role in the murder nor expressed any degree of remorse. In recorded conversations, the defendant describes his attack on the victim in cavalier terms, stating that

his own strength surprised him, and that the victim "pissed [him] off" and he "cracked." When asked whether he could "go off like that again," he replied that he could. These remarks warrant consecutive sentencing.

The defendant cites no authority for his argument that his lesser sentences should have been merged with his murder sentence. Because this court knows of none, the issue will not be addressed. *See* Tenn. Ct.Crim.App. 10(b).

## XI

Next, the defendant asserts that the trial judge did not properly perform his function as a thirteenth juror because he did not grant the defendant a new trial based on the weight of the evidence. The defendant's contention is limited to his first degree murder conviction.

Tennessee Rule of Criminal Procedure 33(f) provides, in part, as follows: "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." In interpreting the rule, our supreme court has held as follows:

> Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment.

*State v. Carter,* 896 S.W.2d 119, 122 (Tenn. 1995). "The purpose of the thirteenth juror rule is to be a 'safeguard ... against a miscarriage of justice by the jury.'" *State v. Moats,* 906 S.W.2d 431, 434 (Tenn.1995) (quoting *State v. Johnson,* 692 S.W.2d 412, 415 (Tenn.1985) (Drowota, J., dissenting)).

In *Carter,* our supreme court established the standard for determining whether the trial judge has performed his role as thirteenth juror:

> [N]o explicit statement on the record is required by the trial judge that the duty has been performed. Accordingly, where a motion for new trial is denied without a statement, an appellate court may presume that the trial judge approved the jury's verdict as the thirteenth juror.

896 S.W.2d at 120.

In ruling on the defendant's Motion for New Trial, the trial court stated as follows:

> The Court—I might add though the Court in reviewing all these and reviewing the evidence in this case the Court does find as a 13th juror, the Court does approve the finding of the jury and the verdict of the jury in this case because the Court finds that based on the evidence it was presented to the jury certainly a reasonable trier of fact could find that all those elements of the murder in the first degree ... were certainly made out and a reasonable trier of fact could find that those elements were made out beyond a reasonable doubt and I find that the jury's verdict was not based on passion or caprice or anything other than the evidence and the law.

In our view, the trial court exercised its role as a 13th juror and approved the jury's verdict of guilt on the defendant's first degree murder charges.

## XII

The defendant next contends that the trial court erred by submitting both of the first degree murder charges against him to the jury. He maintains that the jury's verdicts of guilt as to both premeditated murder and felony murder resulted in a violation of his rights under Article I, §§ 6,

8, and 10 of the Tennessee Constitution. He also alleges error in the jury's failure to specify the felony underlying his felony murder conviction.

■ Initially, we note that the principles of double jeopardy were not violated by the verdicts of guilt as to both premeditated murder and felony murder. The trial court did not enter a judgment on each verdict; instead it merged the two verdicts and entered one judgment of guilt as to first degree murder. As recognized by the defendant, this court has previously approved of this approach, and has determined that it does not violate the Double Jeopardy Clause of the Tennessee Constitution:

> The Double Jeopardy Clause[s] of both the United States and Tennessee Constitutions state[ ] that no person shall be put in jeopardy of life or limb for the same offense. U.S. Const. amend. 5; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). *State v. Phillips,* 924 S.W.2d 662, 664 (Tenn.1996). It is the last protection that is of interest in this case.
>
> Although the jury returned guilty verdicts for both counts of first degree murder, the trial court entered only one judgment of conviction that imposed only one sentence of life imprisonment. Essentially, it is the judgment of conviction that provides the legal authority for the executive branch of government to incarcerate a

person who is sentenced to confinement. *See State v. Vasser,* 870 S.W.2d 543, 546 (Tenn.Crim.App. 1993). In this sense, it includes the imposition of the sentence by which a defendant is punished. *See* Tenn. R.Crim.P. 32(e). Therefore, the trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same offense. No double jeopardy peril exists.

*State v. Addison,* 973 S.W.2d 260, 266–67 (Tenn.Crim.App.1997); *see also State v. Cribbs,* 967 S.W.2d 773, 787–88 (Tenn. 1998); *State v. Zirkle,* 910 S.W.2d 874, 889–90 (Tenn.Crim.App.1995).

■ From a purely procedural standpoint, however, we must observe that the trial court erred by failing to note on the judgment that it was merging the defendant's two first degree murder convictions, a requirement established by this court in September, 1999:

> In a case involving a single killing where the jury has found the defendant guilty under both theories of first degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. The single judgment of conviction should note the merger of the two counts returned by the jury.

> \* \* \*

> In situations such as this, the appropriate procedure is for the trial court to specifically note the merger of two convictions of first degree murder in one judgment ... reflecting a conviction of first degree murder.

*State v. Redonna T. Hanna,* No. 02C01–9806–CR–00165, 1999 WL 689414 (Tenn. Crim.App. at Jackson, Sept. 7, 1999). Accordingly, the judgment of first degree murder entered by the trial court is modified to show that the defendant's convictions for premeditated murder and felony murder were merged into one judgment.

The defendant argues that by merging his premeditated murder and felony murder convictions, the trial court improperly usurped the jury's authority to determine the proper judgment on his convictions. In support of his position, the defendant cites Tenn.Code Ann. §§ 39–13–204 and 40–20–101(a), which provide, respectively, that the jury is to determine sentencing in a first degree murder case and that the trial court shall pronounce judgment pursuant to a verdict against a defendant. We fail to see how these two statutes preclude a trial court's merger of two first degree murder convictions for purposes of sentencing and judgment. Moreover, this argument overlooks the trial court's ultimate authority to accept or reject a jury verdict of guilt, Tenn. R.Crim.P. 33(f), and to determine the appropriate judgment on a jury verdict. "[T]he trial court has the power to enter the appropriate judgment. This authority does not impinge upon or amend the verdict so long as the judgment does not subject the defendant to a conviction and sentence which exceeds the jury's determination of culpability." *State v. Hill,* 856 S.W.2d 155, 157 (Tenn.Crim.App.1993).

The defendant also asserts that the jury failed to state the underlying felony on which it based its felony murder conviction. We are uncertain as to the purpose of this assertion: The defendant does not explicitly label it as error and does not cite any authority for the proposition that it is error. As such, this court considers the issue waived. *See* Tenn.Ct. Crim.App. 10(b). However, even if it were not waived, we would find no error. *See State v. Cravens,* No. 03C01–9309–CR–00319, 1994 WL 444623 (Tenn.Crim.App. at Knoxville, Aug. 16, 1994).

XIII

Finally, the defendant asserts that the trial court's charge to the jury on the statutory aggravating circumstances applicable to his first degree murder sentence was erroneous to the extent that it included Tenn.Code Ann §§ 39–13–204(i)(6), (7), and (14). This court's review of the defendant's first degree murder sentence is limited. In reviewing the appropriateness of a sentence of life imprisonment without the possibility of parole, this court may not disturb the jury's determination unless the sentence was imposed arbitrarily so as to constitute a gross abuse of the jury's discretion. Tenn.Code Ann. § 39–13–207(g). In our view, the trial court's charge to the jury was proper.

In this case, the trial court charged the jury that it could consider the following aggravating circumstances in determining the defendant's first degree murder sentence:

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;

(6) The murder was for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another;

(7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery; and

(13) The defendant knowingly mutilated the body after death.

Tenn.Code Ann. § 39–13–204(i)(5)(7), (13). The jury found all four aggravating circumstances to have been proved beyond a reasonable doubt.

The defendant first complains that the jury's use of the felony murder aggravator violated the due process and double jeopardy clauses of the Tennessee Constitution. The defendant appears to argue that he is being triply punished to the extent that he was convicted of and sentenced for aggravated robbery, convicted of felony murder with aggravated robbery as the underlying felony, and sentenced to life without parole based on the felony murder aggravator. In our view, this issue is without merit.

First, the defendant's convictions for aggravated robbery and felony murder do not violate the principles of double jeopardy. Because the trial court merged the felony murder conviction into the premeditated murder conviction, this issue has been effectively preempted. Dual convictions of aggravated robbery and premeditated first degree murder do not violate double jeopardy protections. *See Welch v. State,* 836 S.W.2d 586, 588–89 (Tenn.Crim.App.1992). However, even if the defendant had been convicted only of felony murder, the conviction for aggravated robbery would nevertheless stand. *State v. Blackburn,* 694 S.W.2d 934, 936–37 (Tenn.1985); *State v. John Robert Tory,* No. 03C01–9306–CR–00202, 1994 WL 398808 (Tenn.Crim.App. at Knoxville, Aug. 3, 1994) (holding that a conviction for felony murder and the underlying felony of especially aggravated robbery did not violate double jeopardy principles).

Second, there was no constitutional error in the jury's application of the felony murder aggravator. In our assessment, this issue is controlled by *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), and its progeny. In *Middlebrooks,* the defendant was convicted of felony murder and aggravated kidnapping. The jury sentenced the defendant to death based upon two statutory aggravating circumstances: that the murder was especially heinous, atrocious, or cruel, and that the murder was committed while the defendant was engaged in committing a felony. *Id.* at 325–26. On appeal, this court affirmed the defendant's felony murder conviction and sentence. Our supreme court reversed the sentence, however, holding that the application of the felony murder aggravator in determining the sentence was unconstitutional because it failed to sufficiently narrow the class of death-eligible murderers. *Id.* at 346.

Initially, we note that because this is a not a capital case, there can be no *Middlebrooks* error. Both our supreme court and, more recently, this court, have held that use of the felony murder aggravator to enhance a felony murder sentence from life to life without parole does not implicate the same constitutional concerns as use of the aggravator to enhance a felony murder sentence to death. *See State v. Butler,* 980 S.W.2d 359, 361–62 (Tenn. 1998); *State v. Lacy,* 983 S.W.2d 686, 696 (Tenn.Crim.App.1997).

Moreover, even if this were a capital case, *Middlebrooks* would not require a finding that the jury's application of the felony murder aggravator was error. Because the defendant was also convicted of premeditated murder, the felony murder aggravator was not duplicative of the elements of the offense. *See State v. Cribbs,* 967 S.W.2d 773, 787 (Tenn.1998) ("When a defendant is convicted of premeditated murder, and the felony murder aggravating circumstance is employed to support imposition of the death penalty, *Middle-*

*brooks* is not implicated."); *State v. Hall,* 958 S.W.2d 679, 692 (Tenn.1997) ("[I]n *Middlebrooks* a majority of this Court held that application of the felony murder aggravating circumstance is appropriate only if the defendant is convicted *solely* on the basis of felony murder. Implicit in that statement is the recognition that the circumstance properly may be applied if a defendant is convicted of premeditated first degree murder.").

■ Next, the defendant contends that there was insufficient evidence to support the trial court's charge to the jury that it could consider as an aggravating factor that the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution." Tenn.Code Ann §§ 39–13–204(i)(6). We disagree. There was sufficient evidence in the record to support the trial court's charge. Jeannie Bliek testified that the defendant stated that he killed the victim after having been "caught in the act." Likewise, Kevin Green testified that the defendant "got caught," "figured out he was busted," and "panicked." The testimony of these two witnesses clearly supports a finding that the defendant killed the victim as a means to prevent the victim from prosecuting him for trespass and/or theft.

■ Finally, the defendant maintains that the trial court erroneously charged the jury that Tenn.Code Ann. § 39–13–204(i)(13), that the "defendant knowingly mutilated the body of the victim after death," could be found as an aggravating circumstance. In doing so, the defendant correctly asserts that the only support for this charge lies in evidence that the defendant caused flash burns to the victim's face, which Dr. Harlan testified occurred after death. The defendant incorrectly asserts, however, that the term "mutilate" does not encompass incineration of a victim. While it is true that the term "mutilate" is not defined anywhere in our statutory code, at least two sections of the code implicitly recognize that the term includes destruction by fire. *See* Tenn.Code Ann. §§ 10–7–104, 66–24–108. Additionally, the definitions of "mutilation" contained in both Black's Law Dictionary and Webster's New International Dictionary are sufficiently broad to encompass destruction by fire. Black's Law Dictionary defines "mutilation" as follows: "2. *Criminal law.* The act of cutting off *or permanently damaging* a body part, especially an essential one." *Black's Law Dictionary* 1039 (7th ed.1999) (emphasis added). Webster's defines "mutilate" as: "1: to cut off or *permanently destroy a limb or essential part* of . . . . 2: to cut up or *alter radically so as to make imperfect* . . . ." *Webster's New International Dictionary,* 1493 (3d ed.1993) (emphasis added).

Several other jurisdictions have addressed the breadth of the term "mutilate" in the context of the application of a statutory aggravating circumstance and have concluded that it encompasses destruction by fire. In particular, the decision of the Nevada Supreme Court in *Byford v. State,* 994 P.2d 700 (Nev.2000), is instructive in this regard. In *Byford,* the defendant was convicted of first degree murder and sentenced to death. In determining the sentence, the jury relied upon the aggravating circumstance that "[t]he murder involved torture or the mutilation of the victim." *Id.* at 716. The court rejected the defendant's challenge to the applicability of that aggravator, finding that it encompassed mutilation of the victim after death and that mutilation included setting the victim's body on fire:

> We agree with the State's assertion that the legislative intent in making mutilation an aggravating circumstance "was to discourage the desecra-

tion of a fellow human being's body." We therefore take this opportunity to expressly hold that mutilation, whether it occurs before or after a victim's death, is an aggravating circumstance under NRS 200.033(8).

Postmortem mutilation occurred here when Byford set the body on fire.... *Id.* at 717.

 We are persuaded by the Nevada court's reasoning in *Byford* that the application of fire to a victim's body falls within the meaning of "mutilate" as that term is used in Tenn.Code Ann. § 39–13–204(i)(13). Because Tenn.Code Ann. § 39–13–204(i)(13) specifically addresses itself to mutilation of a victim after death, the only logical conclusion to be drawn regarding the legislative intent underlying that section is that the General Assembly, like the Nevada legislature, meant to discourage corpse desecration. In our view, destruction, in whole or in part, by fire is certainly one of the most offensive forms of corpse desecration. As such, we find that it falls within the purview of Tenn.Code Ann. § 39–13–204(i)(13) and that the trial court properly instructed the jury on the application of that section as an aggravating circumstance.

Accordingly, the judgment of the trial court is affirmed as modified.