# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
October 6, 2009 Session

## STATE OF TENNESSEE v. CARLOS JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-04471     James C. Beasley, Jr., Judge**

---

**No. W2008-02584-CCA-R3-CD  - Filed September 30, 2010**

---

Defendant-Appellant, Carlos Jones, was convicted by a Shelby County Criminal Court jury of voluntary manslaughter and especially aggravated robbery. The trial court sentenced Jones to consecutive sentences of seven years at thirty-five percent for the voluntary manslaughter conviction and thirty-three years at one hundred percent for the especially aggravated robbery conviction, for an effective sentence of forty years in the Tennessee Department of Correction. On appeal, Jones argues that the trial court erred in allowing a witness to testify about out-of-court statements made by a non-testifying co-defendant in violation of Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968). Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the defendant-appellant, Carlos Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy P. Weirich, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the robbery and death of Leonard Thomas, the victim, on December 11, 2006. Mario Hampton and Carlos Jones, the Defendant-Appellant, were both indicted for the offenses against the victim and were jointly tried. It is important to note at the outset that prior to trial, Hampton's attorney filed a motion for severance on the ground that a joint trial would unfairly prejudice his client because Jones's statements would incriminate Hampton. However, Jones did not join in this motion and was not present at the

hearing. Regardless of the motion for severance, the State assured the court that it would not introduce Jones's written statement to law enforcement because the statement could not be redacted so as to prevent a Bruton violation. The trial court denied the motion for severance based on the State's assurances. During the joint trial, the State's theory was that the victim was shot during an armed robbery related to competition between drug dealers and that the robbery and shooting were devised by Hampton and Jones and were executed by Jones.

**Factual Background.** On December 11, 2006, Pamela Bogard was at her home on Ledbetter Avenue in Memphis, Tennessee, smoking crack cocaine with her friends. When the group used all of their drugs and were unable to contact their regular drug dealer, Mario Hampton, Bogard's friend Lisa called another drug dealer, the victim, to purchase crack cocaine. When the victim arrived at Bogard's home, he began selling crack cocaine to other individuals who had been trying to contact Hampton. Hampton and Jones eventually arrived at Bogard's house a few hours later. Bogard overheard Hampton complaining that the victim had sold crack to individuals on his "dope track." Hampton did not confront the victim face to face; instead, Jones relayed messages by walking back and forth between Hampton, who was in the kitchen, and the victim, who was in the living room. Bogard said that Hampton told Jones that he needed to find out how much "dope" the victim had on his person and that they should "take that [m — f — 's] money." Bogard said that Hampton had a gun that he placed on the kitchen table when he first entered her home. The victim ultimately left Bogard's home because he believed that Hampton and Jones were attempting to start a fight with him.

Bogard saw Hampton and Jones quickly leave her home immediately after the victim left. She later heard gunshots but did not call the police. Minutes after the gunshots, Hampton walked back into Bogard's home to get his girlfriend, Latasha Rankins. As Rankins was getting into Hampton's car, Jones told Rankins that Jones had "got[ten] that [n — ][,]" which she understood to mean that Jones "had robbed" the victim of his drugs. She said that Jones acknowledged shooting the victim but did not say that he killed the victim. Rankins stated that Jones was wearing "[a] black shirt with dice on it" that night. Hampton and Rankins took Jones home and then drove to Bow Street where Hampton collected some shell casings that were in the street.

Orlando Carradine drove the victim to Bogard's home on Ledbetter Avenue to conduct the drug deals on December 11, 2006. Carradine was the victim's driver because the victim did not have a valid driver's license. Carradine had been driving for the victim for over a year in exchange for drugs, money, and food. Carradine was in Bogard's kitchen when Hampton and Jones entered the home. He heard Hampton say that the victim was selling crack on "his turf." Carradine observed the victim talking to Jones, but he did not hear Hampton or Jones make any threats to the victim.

When Carradine and the victim left Bogard's home, they picked up some chicken and went back to their house to eat with friends. Approximately forty-five minutes later, someone called the victim and asked him to return to Bogard's home so that he could purchase some crack cocaine. Carradine drove back to Bogard's home with the victim in the front seat and Carradine's cousin, Jarrod Johnson, in the back seat. When they arrived at Bogard's house, Jones approached the car and informed them that the buyer was on his way. Only minutes later, Hampton arrived and pulled his car behind the vehicle that Carradine was driving. Shortly thereafter, an SUV stopped in front of Bogard's home. Jones spoke to the individual driving the SUV, and the SUV left. Jones got into Hampton's car and talked to Hampton before walking to the victim's car. Jones then told the victim that he would take him to the buyer's home. Jones got in the backseat of the victim's car, and Carradine drove a short distance down Ledbetter Avenue until Jones told Carradine to stop the car. Jones gave the victim seven dollars for a piece of crack cocaine. Jones indicated that he was going to sell it to the buyer for twenty dollars so that he could make some money from the deal. As he was getting out of the car, Jones suddenly informed the victim that he "want[ed] it all." Carradine heard a "click, click" sound and saw that Jones had a gun that he believed was a nine millimeter. Carradine also saw Jones take all the victim's crack cocaine, which was worth approximately two to four hundred dollars as well as the seven dollars that he had just paid the victim. The victim grabbed Jones's gun, and they began fighting over it. During the struggle, the victim forced Carradine out of the vehicle and onto the street. Carradine then heard five gunshots fired. He saw Jones fire two more shots as he ran away from the car. Before Carradine could lift himself from the street, the victim drove away in the car. Carradine hid in some nearby bushes and saw Hampton drive by and pick up Jones. He also observed Hampton and Jones collecting the shell casings left in the street. That afternoon, Carradine gave a statement to the police about the incident and identified Hampton and Jones in a photo spread. Carradine also identified Jones as the individual who shot the victim at trial.

Jerrod Johnson was in the backseat of the victim's car at the time that the victim was shot. Johnson rode with the victim and Carradine when they went to Bogard's house for a drug sale in the early hours of December 11, 2006. Johnson said that he became concerned when a car pulled in behind them and a SUV stopped in the street. Jones got in the backseat with Johnson and asked for a ride to his grandmother's home. Johnson said that Jones had on "[a] black skull cap, black shirt with dice on it, with black pants." Jones told Carradine to stop the car and asked the victim "to serve him something for seven[,]" which meant that Jones was asking the victim to sell him some crack cocaine for seven dollars. When the victim pulled out his bag containing the drugs, Jones pointed a .380 caliber gun at him and told him to give him all of his drugs and money. Johnson said that the victim gave Jones his seven dollars back and the bag "containing a stack of rocks" of crack cocaine, and Jones told him that he wanted all of the victim's money as well. The victim refused, and Jones and the victim began struggling over the gun. Jones began shooting inside the car. Johnson said that

Carradine fell out of the car, and Johnson believed that Carradine had been shot. Johnson was frozen with fear during the shooting, and the victim moved over into the driver's seat and attempted to drive away. As the victim began to faint, Johnson helped the victim move to the passenger side and then drove him to the hospital. The police took Johnson into custody while at the hospital. Johnson gave a statement to the police but did not identify Jones in the photo spread. Johnson claimed that he failed to identify Jones on the photo spread because he was too nervous to read the photo spread sheet. At trial Johnson identified Jones as the individual who shot and robbed the victim

Christy Parks was a passenger in the SUV that stopped outside of Bogard's house on Ledbetter Avenue in the early hours of December 11, 2006. Parks said that her friend, Desmond Woods, was driving the SUV and intended to buy some drugs at that house. She said Woods followed Hampton's car after it backed out of the driveway and drove away. When Parks and Woods stopped near Bow Street and Leacrest Avenue, Parks heard gunshots coming from the vehicle behind them. Parks saw someone firing a gun in the car and then saw a man fall out of the car. Then she saw the shooter run to Hampton's car and get inside. Parks said that the shooter was wearing "some dark colored clothes and a hat with the strings . . . at the end of it."

The following day, Parks was with Woods, Woods's girlfriend, Hampton, and Hampton's girlfriend when Hampton was arrested. Parks gave a statement to the police, but she was unable to identify the shooter in a photo spread. After the police released them, Parks and Hampton's girlfriend, Latasha Rankins, went to Hampton's parents' house where Rankins got a gun from Hampton's vehicle and gave it to Hampton's father.

Larry Gilliam owned a rental house located at 4217 Bow Street [Gilliam's video testimony]. At sunrise on December 11, 2006, his tenants living at this house contacted him to come to the house. As Gilliam was sitting in his truck in the driveway of the rental home at 6:00 or 6:30 a.m., he saw Hampton drive down Bow Street and stop across the street about two houses away. He observed Hampton exit his vehicle and collect three objects from the street. Hampton then got back in his car and left the area. Gilliam subsequently gave a statement to the police and identified Hampton in a photo spread.

Sergeant John Oliver and Detective William Acred were assigned to investigate the victim's homicide. These officers arrested Hampton based on the information they received from Sergeant Anthony Mullins. After Rankins informed the officers that Jones was the individual who shot the victim, Jones was arrested. After interviewing Carradine, the officers went to the location of the shooting and discovered one spent shell casing. In addition, Sergeant Mullins conducted an examination of the victim's vehicle and discovered a single hole in the "left rear floorboard" of the car as well as a substance that appeared to be blood on the outside of the right passenger door and on the inside of the car. Sergeant

Mullins collected the shirt that Jones was wearing "inside out" at the time of his arrest. This shirt, which was black "with gray dice on the front," matched the description that another witness had given regarding the clothing that Jones was wearing at the time of the incident.

Dr. Bruce Levy, who was declared an expert in forensic pathology, performed an autopsy of the body and concluded that the victim's cause of death was a single gunshot wound to the right side of the back. Dr. Levy said that the bullet struck the victim's right lung and liver, which caused internal bleeding. Because Dr. Levy did not know the position that the victim was in when he was shot, he could not pinpoint the exact trajectory of the bullet that killed him.

At the conclusion of the trial, Jones was convicted of voluntary manslaughter and especially aggravated robbery and received an effective sentence of forty years. Jones filed a timely motion for new trial, which the trial court denied. Jones then filed a timely notice of appeal.

**ANALYSIS**

Jones argues that the trial court erred in admitting Pamela Bogard's testimony regarding out-of-court statements made by Jones's co-defendant, Mario Hampton. He contends that Hampton's statements violate Bruton because they implicate him in the victim's robbery and death without giving him the opportunity to cross-examine Hampton at trial. He also asserts that the trial court failed to follow the provisions of Tennessee Rule of Criminal Procedure 14(c)(1), which requires the State (1) to refrain from offering the evidence if admission of the evidence would be error, (2) to admit the evidence only after all references to the moving defendant are deleted so long as the redacted confession does not prejudice the moving defendant, or (3) to sever the trial. Jones asserts that although the appeal relates to the trial court's decision not to sever, the basis of his appeal is the violation of his Sixth Amendment right of confrontation. Finally, citing State v. Crabtree, 655 S.W.2d 173, 178 (Tenn. Crim. App. 1983), superseded by statute on other grounds as stated in State v. Walker, 910 S.W.2d 381, 385 (Tenn. 1995), Jones acknowledges the rule that a conspirator's declarations in furtherance of the conspiracy are admissible against a co-conspirator; however, he argues that the State clearly abandoned its conspiracy claim against Jones, thereby making Hampton's incriminating statements inadmissible.

In response, the State argues that the trial court properly admitted Hampton's statements. It contends that this court, relying on Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 2081-82 (1985), held that Bruton is not controlling where the co-defendant's statement is nonhearsay. See State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000), perm. to appeal denied (Tenn. Feb. 26, 2001). The State argues that Hampton's statements in this case were not hearsay and did not violate Bruton because Hampton's statements were

necessary "to provide [a] context for [Jones's] statements and actions at the house on Ledbetter [Avenue]." Moreover, the State contends that even if Hampton's statements were improperly admitted, the error was harmless, given the overwhelming evidence of Jones's guilt. See Tenn. R. App. P. 36(b); Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979); State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008).

We agree with the State that Tennessee v. Street, 471 U.S. 409 (1985), and State v. Price, 46 S.W.3d 785 (Tenn. Crim. App. 2000), are controlling in this case. Both Street and Price hold that nonhearsay statements do not violate a defendant's right to confront witnesses. As we will fully explain below, Hampton's statements were admissible nonhearsay because they provided a context for Jones's actions and statements at Bogard's house on Ledbetter Avenue and because they were used to prove the effect they had on Jones. However, because the record shows that the above objections were primarily raised by Hampton's attorney and apparently later adopted by Jones, a detailed discussion of Hampton's arguments is necessary for a full understanding of this issue.

In this case, prior to Pam Bogard's testimony and outside the presence of the jury, Hampton's attorney requested that the trial court exclude Bogard's testimony about statements made by Jones in her presence. Jones's attorney joined in this request regarding Bogard's testimony about statements made by Hampton in her presence. Hampton's attorney argued that Bruton requires that the defense be given the opportunity to cross-examine Jones if Bogard testified about any statements made by Jones. The court responded that it believed that Bogard's testimony regarding statements made by Hampton or Jones would be admissible under Rule 803 as an exception to hearsay because they were admissions of a party opponent. The court was unsure whether parts of Bogard's testimony needed to be redacted because of confrontation clause issues.

Bogard was placed on the stand during the State's offer of proof. Bogard testified that Hampton and Jones "were upset because [the victim] was selling dope to [Hampton's] customers." She continued:

> [Hampton] called me in the back room and asked me if I had called [the victim] there, and I told him, no. That Lisa did. And he was visibly and verbally upset about it. And he went back into the kitchen and he was just, you know, talking and cussing about the fact that [the victim] was there, and you know, that that was his spot.

Bogard stated that Hampton then told Jones, "We ought to rob that [n — ] and just go see what's up with that [n — ]. What he all about. [Then Hampton] asked a couple of times how much dope did [the victim] have." She explained that Jones "was going back and forth in and out of the kitchen, talking to [Hampton] and going back and saying stuff to [the victim]."

-6-

Bogard said that when Hampton said they needed to rob the victim and take his money and drugs, Jones said, "[W]hat's up, what [do] you want [me] to do[?]" She explained that Hampton was giving Jones drugs in exchange for him saying threatening things to the victim. Bogard then testified as follows:

Q. Okay. What were [Jones] and [the victim] talking about?

A. [Jones] was picking at [the victim] about his neighborhood. [Jones] was saying that Westwood was the baddest hood, that they merked [m – f – ] from the south. And [the victim] would respond by saying, you know, I give Westwood its props, but Westwood can't, you know, can't compare . . . to the dirty, meaning South Memphis. They call South Memphis the Dirty South.

Q. While they were having that conversation, where were you?

A. I was just kind of back and forth because Pops, the guy whose niece owns the house had asked me to keep an eye on the house. So whenever I know that he would be – when Pops would be in the back smoking, I would just kind of keep an eye on things because people would sometimes come in and, you know, take food and stuff like that.

Q. Okay. What happened next?

A. Well, after a few conversations with – back and forth with [Jones], [the victim] finally told me that, you know – his exact words were, I'm going to bounce because these [n — ] trying to trip. And so, we sat and talked a little bit longer and then he finally got up and left.

Q. [The victim] did?

A. Yes.

Q. Okay. Were . . . Mario Hampton and Carlos Jones . . . still there when he left?

A. They left right – like they was [sic] scurrying to get their stuff right after they knew he left.

Q. Okay. When they left, when Mario Hampton and Carlos Jones left, did you ever talk to either one of them again that night?

-7-

A. No. Well, yes, I did.

Q. When?

A. Right after we heard the gunshots.

Q. Who did you talk to?

A. Mario [Hampton].

Q. And [did you talk to] Mario [Hampton] – on the phone?

A. Yes.

Q. What did [Hampton] tell you?

A. To tell his girlfriend, Tasha, to come out [of] the [m — f — ] house right now.

Q. Was that it?

A. Yes.

Q. Okay.

Following the offer of proof, Hampton's attorney objected to Bogard's testimony regarding Jones's statements because they implicated Hampton]. Specifically, Hampton's attorney was concerned about Bogard testifying that Jones asked Hampton what he wanted him to do about the victim. The court acknowledged that Jones's statement did implicate Hampton, but he asked Hampton's attorney to state the legal basis for its exclusion. Hampton's attorney responded by asking if he would be able to put Jones on the stand to ask him if he ever made that comment to Hampton. The court said, "I don't know whether you can or not . . . . " Hampton's attorney replied, "It's an out of court statement that I cannot cross examine. I cannot put Carlos Jones on the witness stand for him to deny or admit making that statement, Judge. We are denying he ever made that statement. I cannot put Carlos Jones on [the stand] to cross examine him." Hampton's attorney then argued:

> [When you have] Mario Hampton saying, we're going to get this guy, and [Jones's] response, what do you want me to do to him? And then the follow-up from Mario Hampton, do this to him. We're going to rob him. Then it does directly implicate Mario Hampton, Judge.

-8-

That statement by itself [does not implicate Hampton], no. But it's being introduced in between these other two statements.

The trial court responded that Jones's statement was an exception to the hearsay rule because it was a statement by a party opponent under Rule 803 that was "being offered by the State against Mr. Jones. Not against Mr. Hampton[.]" The court further stated that there was no <u>Bruton</u> issue because Jones "doesn't say, Mr. Hampton, what do you want me to do? He doesn't mention that name and there's not anything that you can exclude. [There are] not any confrontational issues that I can see." Hampton's attorney replied that Jones and Hampton were having a discussion, so it was obvious that they were speaking to each other. Hampton's attorney said, "If the statement is introduced, Judge, of a co-defendant, it's a violation of Mr. Hampton's Sixth Amendment Right of confrontation for me not to be able to question that person about those statements." The court then asked about its options when dealing with a <u>Bruton</u> issue. Hampton's attorney said that the court should sever the defendant so that Jones's statements would not affect Hampton. He then reminded the court that at the severance hearing the State had assured the court that it would not introduce any of Jones's statements at trial. The State interjected that it had actually informed the court at the motion hearing that it was not going to introduce Jones's written statement to law enforcement at trial, and the court made the decision at the hearing to try the defendants together. Hampton's attorney said that he had originally filed his severance motion because he did not want his client tried with any of Jones's statements implicating Hampton when he was not able to call Jones to the stand to question him about these statements. He also reminded the court that <u>Bruton</u> is not limited to written statements of co-defendants. He continued, "I would submit [that counsel for] Mr. Jones, regarding Mr. Hampton's statements, has a much stronger argument than I do [because the majority of the statements sought to be introduced by the State were made by Hampton]. [But] I would submit I've got a pretty strong [<u>Bruton</u>] argument."

The State countered that Rule 14(c)(1) of the Tennessee Rules of Criminal Procedure states that a defendant may move for a severance if an out-of-court statement of a co-defendant makes a reference to the defendant. The State argued that Rule 14(c)(1) does not apply because none of the statements it sought to introduce through Bogard made reference to the other defendant. The State maintained that this was "not a situation where . . . Carlos Jones told me that Mario Hampton set this up . . . . Or Mario Hampton told me he was going to get Carlos Jones to kill that man and Carlos did it and we pulled it off and great." The State argued that this was not a <u>Bruton</u> or Rule 14 problem. Hampton's attorney responded that it was, in fact, a <u>Bruton</u> problem because "[i]t's an out of court statement of a co-defendant being offered to implicate my client. And I can't cross examine him." Jones's attorney added that the majority of the statements elicited by the State were from Hampton, and that Rule 803.1.2, admission of a party opponent, provides that the statement that is offered against a party must be that party's own statement. However, he argued in this

-9-

situation, Hampton's statements were being offered against Jones. The court responded, "Your client's statements are being offered against your client. These are separate trials. Statements are being offered against [Jones]. Statements are being offered against [Hampton]." Jones's attorney then argued that the statements of Jones and Hampton should not be admitted under Tennessee Rule of Evidence 803 because they were hearsay.

Hampton's attorney added, "You're talking about a conversation between two people – [the State's] whole theory is these two people plotted to do this and they're going to introduce a conversation saying they were plotting to do it . . . and then say, well, they weren't implicating each other." The court maintained that the statements made by the co-defendants were admissible. Hampton's attorney responded that Jones's statements violated Hampton's Sixth Amendment right of confrontation. The court and Hampton's attorney then had the following exchange:

| | |
|---|---|
| The Court: | . . . I'm going to rule that they can come in. I think that they're admissible and – |
| [Hampton's attorney]: | Are you going to allow me to call Mr. Jones as a witness, Judge? |
| The Court: | No, sir, not unless his lawyer wants to put him on the stand. |
| [Hampton's attorney]: | So, you're ruling that there's no [Bruton] issue whatsoever with these statements. |
| The Court: | Yes, I am ruling that. |

Prior to Bogard's testimony at trial, Jones's attorney requested a bench conference out of the presence of the jury. He then argued that if the trial court's ruling was that the statements made by Hampton and Jones were admissible because they were statements of a co-conspirator, this was improper because the State had not laid the proper foundation for a conspiracy and the co-defendant's statements themselves could not be used to establish a conspiracy. He then asserted that the statements, which were hearsay, could not be admitted without an exception to the hearsay rule. After much discussion among both defense attorneys, the State, and the trial court, the court ordered a brief recess to consider the admissibility of these statements. The court then ruled that Bogard's testimony regarding the statements made by Jones and Hampton was admissible:

[A] [h]earsay statement is a statement other than one made by the declarant while testifying at a trial or hearing offered in evidence to prove the truth of the matter asserted.

That's what hearsay is.

Two things strike me with regard to these statements that are being offered.

First of all, they're not being offered for the truth of the matter asserted in those statements.

There's nothing in that statement, we ought to rob this guy, we ought to kill this guy. That is not being offered to prove that we ought to or we have to or we are going to. That is simply a statement. We ought to kill this guy. We ought to rob this guy.

That's with regard to Mr. Hampton.

Mr. Jones' statement, what do you want me to do. Is not offered for the truth – it says nothing. That's just a declaration. What do you want me to do.

So, first of all, in my opinion, they are not hearsay statements. So, they're admissible because they're not hearsay.

But if you analyze it even further and look at hearsay exceptions, in my opinion, the – at least with regard to Mr. Hampton . . . , it goes to his mental state, his intent, his motive, if it's going to . . . qualify as hearsay, at least in my mind, [because] it goes to his mental state at the time, going to his intent or his motive.

But I don't even think we get to that because I don't think it's a hearsay statement. I think it's just a statement made by Mr. Hampton. It's not offered to prove the truth of what he's saying.

And Mr. Jones'[s] statement is nothing more than a declaration.

I don't think those meet the criteria or the test of hearsay.

. . . .

-11-

So, for those reasons, I still think that my ruling is proper and correct and that the testimony [from Bogard about the statements made by Jones and Hampton] can come in.

I don't think there is a confrontational issue because the witness[, Bogard,] making the statement is here to testify.

She can be cross-examined as to what she heard. I will advise the jury that these statements can be used only against each individual defendant and I'm satisifed that they're admissible for those reasons.

Jones's attorney requested that the court give a curative instruction to the jury that the statements were not being admitted for the truth of the matter asserted. However, the trial court refused this request on the basis that it was going to admit the statements because they were nonhearsay. Both Jones's attorney and Hampton's attorney argued that the instruction should include a section stating that Hampton's statements should not be used against Jones and Jones's statements should not be used against Hampton.

The State then called Pam Bogard to the stand to testify in the presence of the jury. She testified, in pertinent part:

Q. All right. So you think it was around midnight when the defendant Mario Hampton and the defendant Carlos Jones c[a]me in the house on Ledbetter?

A. Yes.

Q. What were they doing?

A. [Hampton] came in with crack and marijuana and he was sitting at the table in the kitchen breaking down his weed.

. . . .

Q. [W]as [the victim] still in the house?

A. Yes.

Q. Where was he in the house?

A. He was in the living room with me.

-12-

Q.      The living room next to the kitchen?

A.      Yes.

Q.      Where was Carlos Jones?

A.      He was back and forth throughout the house.

Q.      Were people talking?

A.      Yes.

Q.      What was the conversation?

A.      [Hampton] was very upset about [the victim] being there selling dope.

Q.      How could you tell?

A.      Well, he called me in the back room and asked me if I had called [the victim] there and I told him, no, that Lisa did. And he said, awright [sic], I got that [b — ]. And then he went back in the kitchen, and they were just mouthing out loud where they could be heard about [the victim] being there, about – [Hampton] made the comment several times, this [is] my [m — f — ] spot, I built this. This my track, stuff like that, his dope track. And it was just known that he was upset.

Q.      When he was saying this is my dope track and I made this place and all right I got her. You're telling us today, June 17th, 2008, in Division Ten, you're telling us in a kind of a nice, calm, pleasant voice, is that how he was talking?

A.      No.

Q.      How was he talking?

A.      He was extremely hostile and belligerent. I mean, it was like, you know, I ought to take that [m — f — 's] money. Go see what's up with that [n — ]. That's what he was telling [Jones].

Q.    And was [Jones] saying, come on, man, just settle down.  It's all right.
      Let's just go hang out?

A.    No.

Q.    What was [Jones] doing?

A.    I gotcha, I gotcha.  And then he would go back in the living room and
      make other comments to [the victim].

Q.    What was Carlos Jones talking to [the victim] about?  Was he telling
      him, hey, you might want to get out of here.  My buddy Mario Hampton
      is getting a little mad?

A.    No.

Q.    What was he saying?

A.    Telling him stuff like, South Memphis, you know, Westwood was
      better than South Memphis and [m — f — ] from Westwood merck
      [m — f — ] from South Memphis all the time.  Stuff like that.

Q.    Was [the victim] laughing at him, was he relaxed, was he –

A.    He was laughing it off.  But I mean, he was – at the same time, he could
      tell that something was building, brewing.

Q.    Did Mario Hampton relax after that?

A.    No.

Q.    What did he do?

A.    He asked [Jones] how much dope did [the victim] have?

Q.    What did [Jones] tell him?

A.    ["]I don't know.  You want me to find out?["]  [And Hampton said,
      "]Yeah, find out how much dope that [n — ] got.  I ought to take his
      shit.  We ought to rob that [ m — f — ].["]  Stuff like that.

Bogard stated that Hampton was giving Jones drugs for saying threatening things to the victim. She explained, "[Jones] was just doing everything [Hampton] told him to that night, and you know, you could tell mostly it was because [Hampton] was giving him drugs. Part of it might have been fear."

Prior to cross-examination, the court gave the following instruction to the jury:

> [Y]ou should give separate considerations to each defendant.

> Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant.

> Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant.

> The statements allegedly made by Mr. Hampton are to be considered against Mr. Hampton and the statements allegedly made by Mr. Jones are to be considered against Mr. Jones.

The issue of whether Hampton's statements are hearsay is central to this case. According to Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Recently, there has been disagreement as to whether the standard of review regarding the admissibility of hearsay statements is an abuse of discretion standard or a de novo without a presumption of correctness standard. In Pylant v. State, the Tennessee Supreme Court noted Judge Witt's dissent, wherein he concluded that the admissibility of hearsay statements is a question of law and is reviewed under the de novo without a presumption of correctness standard, rather than under the abuse of discretion standard. 263 S.W.3d 854, 871 (Tenn. 2008) (citing State v. Dennis Pylant, No. M2005-02721-CCA-R3-PC 2007 WL 1890178, at *12 (Tenn. Crim. App., at Nashville, June 29, 2007) (Witt, J., dissenting) (citations omitted), rev'd, 263 S.W.3d 854 (Tenn. 2008). In Pylant, the supreme court also noted Judge Witt's opinion in State v. David Kyle Gilley regarding hearsay:

> In his dissent, Judge Witt, citing Russell v. Crutchfield, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998), advocates for review of the post-conviction court's rulings on whether the proffered testimony was hearsay under a de novo standard of review. Pylant, 2007 WL 1890178, at *12 (Witt, J., dissenting). As Judge Witt has previously noted,

> [When presented with a hearsay objection, a] trial court's first
> duty is to determine whether the out-of-court declarant's
> statement is hearsay–that is, whether it is "offered in evidence
> to prove the truth of the matter asserted." No factual issue
> attends this determination, and it necessarily is a question of
> law. If the statement is offered to prove the truth of the matter
> asserted and no exceptions apply, the statement is, purely and
> simply, inadmissible. At this juncture, the court has no
> discretion to hold otherwise, and to utilize an abuse of discretion
> standard at this point in the analysis "'would have us defer to a
> discretion that the trial court does not possess.'" State v.
> Edison, 9 S.W.3d 75, 78 (Tenn. 1999) (quoting State v. Edison,
> No. 03C01-9605- CC-00199, 1997 WL 1526501, at *8 (Tenn.
> Crim. App. June 18, 1997) (Tipton, J., concurring)) (emphasis
> supplied).

State v. Gilley, [297 S.W.3d 739, 760 (Tenn. Crim. App. 2008), perm. to
appeal denied (Tenn. Feb. 17, 2009] (citations omitted) (emphasis added).
Although this Court continues to believe that questions concerning the
admissibility of evidence are reviewed under an abuse of discretion standard,
we note that, in this instance, the post-conviction court committed error under
either standard of review.

Pylant, 263 S.W.3d at 871. n. 26

On appeal, Jones contends that the admission of Bogard's testimony regarding
Hampton's out-of-court statements violated his Sixth Amendment right to confront a witness.
The Sixth Amendment to the United States Constitution gives an accused the right "to be
confronted with the witnesses against him," and this right is given to the States through the
Fourteenth Amendment. The Tennessee Constitution also gives an accused the right "to
meet the witnesses face to face." The Tennessee Supreme Court has determined that the
confrontation language in the Tennessee Constitution grants a higher right than the similar
language in the Sixth Amendment of the United States Constitution. State v. Deuter, 839
S.W.2d 391, 395 (Tenn. 1992). However, the court subsequently ruled that "we have found
no evidence to have been excluded under our state constitution's confrontation clause that
was not also excluded under the federal constitution's counterpart." State v. Lewis, 235
S.W.3d 136, 144 (Tenn. 2007).

Jones specifically argues, pursuant to Bruton, 391 U.S. at 126, 88 S. Ct. at 1622-23,
that his constitutional right of confrontation was violated when the trial court admitted
Bogard's testimony regarding Hampton's out-of-court statements. In Bruton, the United

-16-

States Supreme Court held that the admission of incriminating hearsay statements by a co-defendant in a joint trial violated the defendant's right of cross-examination guaranteed by the Confrontation Clause regardless of the fact that the trial court instructed the jury to disregard the co-defendant's hearsay statements in determining the defendant's guilt or innocence. Id. at 136-37, 88 S. Ct. at 1628. The Tennessee Supreme Court reiterated, "[T]he Bruton rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfessing co-defendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975). However, in Dorsey the Tennessee Supreme Court stated, "[T]he rule in Bruton does not apply to confessions which [d]o not implicate the non-confessing defendant, nor does it apply to confessions from which 'all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant.'" Dorsey v. State, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978) (quoting ABA Standards Relating to Joinder and Severance § 2.3(a)(ii) (1967)), perm. to appeal denied (Tenn. June 12, 1978).

We have already previously concluded that Tennessee v. Street, 471 U.S. 409, 105 S. Ct. 2078 (1985), and State v. Price, 46 S.W.3d 785 (Tenn. Crim. App. 2000), are controlling in this case. In Street, the State at trial relied on the defendant's detailed confession, which was obtained during an interview with the sheriff and the agents of the Tennessee Bureau of Investigation. 471 U.S. at 411, 105 S. Ct. at 2080. At trial, the defendant testified that he did not burglarize the victim's house or murder the victim. Id. He further testified that his confession was coerced because it was "derived" from the confession of Peele, another participant in the crimes. Id. In rebuttal, the State called the sheriff to testify about the interview with the defendant. Id. The sheriff testified that the defendant was neither shown Peele's confession nor was pressured to repeat the details of Peele's confession. Id. The sheriff then read Peele's confession to the jury. Id. at 412, 105 S. Ct. at 2080. However, prior to Peele's statement being read, the court instructed the jury at two different times that the statement was being admitted for the purpose of rebuttal and not to prove the truthfulness of the statement. Id. The sheriff also testified about the differences between the defendant's confession and Peele's confession. Id., 105 S. Ct. at 2080-81. At the conclusion of trial, the defendant was found guilty and was sentenced to life in prison. Id. The Tennessee Court of Criminal Appeals reversed, holding that the admission of Peele's confession denied the defendant his Sixth Amendment right to confront witnesses. Id. The Tennessee Supreme Court denied the State's application for permission to appeal, and the United States Supreme Court granted certiorari. Id. at 413, 105 S. Ct. at 2081.

The Supreme Court first distinguished Street from Bruton. The court said the issue in Bruton was "whether a co-defendant's confession, which was inadmissible hearsay as to Bruton, could be admitted into evidence accompanied by a limiting instruction." Id. However, in Street the Court held that Peele's confession was not hearsay because it was not introduced to prove the truth of the matter asserted. Id. The Court explained the State's

nonhearsay use of Peele's confession was necessary to rebut the defendant's claim that his confession was "derived" from Peele's confession:

> Before the details of Peele's confession were admitted, the jury could evaluate the reliability of [the defendant's] confession only by weighing and comparing the testimony of [the defendant] and [the sheriff]. Once Peele's statement was introduced, however, the jury could compare the two confessions to determine whether it was plausible that [the defendant's] account of the crime was a coerced imitation.

Id. at 413-14, 105 S. Ct. 2081 (internal footnote omitted). The Court then concluded that admission of Peele's confession did not violate the defendant's Sixth Amendment right to confront witnesses against him:

> The nonhearsay aspect of Peele's confession–not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed–raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination, see Douglas v. Alabama, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076, 13 L. Ed. 2d 934 (1965), was satisfied by [the sheriff's] presence on the stand. If [defendant's] counsel doubted that Peele's confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination [defendant's] counsel could also challenge [the sheriff's] testimony that he did not read from Peele's statement and direct [the defendant] to say the same thing. In short, the State's rebuttal witness against [the defendant] was not Peele, but [the sheriff]. See generally Anderson v. United States, 417 U.S. 211, 219-220, 94 S. Ct. 2253, 2260, 41 L. Ed. 2d 20 (1974).

Id. at 414, 105 S. Ct. at 2081-82. In considering the issue of whether the jury could have misused Peele's confession, the Court noted that the trial court instructed the jury not to consider the truthfulness of the other participant's statement, and concluded that the instructions "were the appropriate way to limit the jury's use of that evidence in a manner consistent with the Confrontation Clause." Id. at 417, 105 S. Ct. at 2083. In addition, the Court noted that unlike the scenario in Bruton, "there were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." Id. at 415, 105 S. Ct. at 2082 (internal footnote omitted). The Court concluded that if all references to the defendant had been deleted from Peele's confession, it would have been extremely difficult for the jury to determine the truthfulness of the defendant's testimony that his confession was coerced. Id. at 415-16, 105 S. Ct. at 2082.

In State v. Price, the defendant argued that the trial court erred in refusing to sever his trial from the trial of "his non-testifying codefendant," Durham. 46 S.W.3d at 802. Relying on Bruton, the defendant asserted that the denial of his motion to sever violated his Sixth Amendment right of confrontation because he was prevented from cross-examining Durham, who elected not to testify, about statements made by Durham during conversations that took place between Durham and the defendant. Id. In this case, Durham either recorded or gave permission to the sheriff's department to record several discussions between Durham and the defendant. Id. at 803. In three of these recorded conversations, the defendant and Durham discussed "how the defendant killed the victim, the status of the investigation, their status as suspects, what the defendant would say to police under questioning, and the disposal of certain evidence." Id. This court determined that Tennessee v. Street, rather than Bruton, was controlling:

> At trial, Durham's statements on the tape recordings were not offered by the state to prove the truth of the matters asserted. Rather, they were offered solely for the purpose of providing the context of the defendant's statements. If Durham's comments had been redacted from the tapes, the defendant's statements would have made little sense. Durham's statements were not intended to be substantive evidence. They are not hearsay and their admission did not implicate the defendant's right of confrontation. See Street, 471 U.S. at 414, 105 S. Ct. 2078; State v. Gibson, 973 S.W.2d 231, 243 (Tenn. Crim. App. 1997) (holding issue of confrontation to be inapplicable to out-of-court statements not offered for truth of matter asserted).

Id. at 804.

Both Street and Price guide our decision in this case. Here, the trial court determined that Hampton's statements were nonhearsay because they were not offered to prove the truth of the matter asserted. See Street, 471 U.S. at 413, 105 S. Ct. at 2081; Price, 46 S.W.3d at 804. We agree that Hampton's statements are nonhearsay. We also agree with the State's assertion that Hampton's statements provide a context for Jones's statements and actions at Bogard's home. See Price, 46 S.W.3d at 804. A review of the transcript in this case shows that Hampton's statements explain why Jones said what he said and did what he did prior to the victim's murder. Regardless of the truthfulness of Hampton's statements, these statements provide motivation for Jones's statements and actions that day.

The concept that a witness's out-of-court statements are admissible if they provide a context for another person's statements is not a new one. The Tennessee Law of Evidence states, "Statements designed to (1) provide a context for, or (2) permit an understanding of, another statement may not be hearsay." Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[10], at 8-25 (5th ed. 2005); see also Price, 46 S.W.3d 7at 804 (stating that the

-19-

statements of a non-testifying codefendant were not offered to prove the truth of the matter asserted; instead, they were offered "for the purpose of providing the context of the defendant's statements"); State v. Derrick Sorrell, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *5 (Tenn. Crim. App., at Jackson, Apr. 8, 2009), perm. to appeal denied, (Tenn. Aug. 17, 2009) ("The audiotape contained a conversation between the defendant and a second person and cannot be barred by the Confrontation Clause because the conversation was not offered for truth, but instead for context and evidence of knowledge."). Similarly, declarations are nonhearsay when they are used to prove the effect on a listener:

> [A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[7], at 8-23 (5th ed. 2005); see also State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (stating that the victim's statement to the defendant was not hearsay because it "was probative not as proof of the matter asserted therein, but because of its effect on the hearer, in this case the defendant, supplying evidence of his motive in returning to the service station later in the day, armed and threatening to kill the [victim]"), perm. to appeal denied (Tenn. Sept. 15, 1980). Accordingly, we conclude that Hampton's statements not only provided a context for Jones's statements and actions but also were used to prove the effect they had on Jones. In either scenario, Hampton's statements are nonhearsay for the purpose of our analysis.

Furthermore, apart from Street and Price, courts have widely held that the admission of nonhearsay is not a Bruton violation. See United States v. Inadi, 475 U.S. 387, 398 n.11, 106 S. Ct. 1121, 1128 (1986) (stating that nonhearsay does not violate the defendant's right to confront witnesses); Anderson v. United States, 417 U.S. 211, 220, 94 S. Ct. 2253, 2260 (1974) ("[S]ince the prosecution was not contending that anything [the non-testifying defendants] said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue.") (internal footnote omitted); White v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) ("Because this testimony was not used for the truth of the matter asserted by the out-of-court declarant, it was not hearsay, and Bruton is inapposite."); United States v. Keith McCain, No. 03 C 4362, 95 CR 509, 2003 WL 22706913, at *1 (N.D. Ill. Nov. 14, 2003) ("If, however, the out-of-court confession is not hearsay, because it is a co-conspirator's statement, or is admissible under one of the exceptions to the hearsay rule, Bruton does not apply."); United States v. Andreas, 23 F. Supp. 2d 835, 844 (N.D. Ill. 1998) ("Bruton is inapplicable to nonhearsay statements being offered to show that the statement was made and not for its truth."). Therefore, because Hampton's statements were nonhearsay, they did not implicate Jones's right of confrontation under Bruton, and their admission was not improper.

However, even if the trial court's admission of Hampton's statements was improper, such error was harmless given the overwhelming evidence of Jones's guilt. King v. State 989 S.W.2d. 319, 329-30 (Tenn. 1999); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Moreover, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict . . . .'" Spicer v. State, 12 S.W.3d 438, 447-48 (Tenn. 2000) (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). Here, the proof against Jones was substantial. Bogard testified that her friend, Lisa, called the victim for drugs instead of Hampton because several individuals at Bogard's home had been unable to locate Hampton, their regular drug dealer. Bogard also testified that Hampton and Jones arrived together at Bogard's house after the victim had made several drug sales to individuals at the residence. Moreover, two eyewitnesses, Carradine and Johnson, testified that they were present at the time that the victim was robbed and shot. Carradine and Johnson each gave a detailed and similar descriptions of the events leading up to the victim's death. Carradine identified Jones in a photo spread the same day of the shooting and again identified Jones at trial as the individual responsible for robbing and killing the victim. Johnson also identified Jones at trial as the perpetrator. Rankins testified that Jones told her he had robbed and shot the victim. Furthermore, both Rankins and Johnson testified that Jones was wearing a black shirt with dice on it the night of the victim's shooting, and Sergeant Mullins testified that he collected the shirt that Jones was wearing "inside out" at the time of his arrest, which was a black shirt "with gray dice on the front." Even if Hampton's out-of-court statements had been excluded, the evidence of Jones's guilt was overwhelming. Accordingly, if the trial court's admission of Hampton's statements was improper, then such error was harmless.

Jones also contends that the trial court failed to follow the provisions of Tennessee Rule of Criminal Procedure 14(c)(1), which requires the State (1) to refrain from offering the evidence if admission of the evidence would be error, (2) to admit the evidence only after all references to the moving defendant are deleted so long as the redacted confession does not prejudice the moving defendant, or (3) to sever the trial. He asserts that although his appeal relates to the trial court's decision not to sever, the basis of his appeal is the violation of his Sixth Amendment right of confrontation. However, previously in this opinion, we have concluded that, since Hampton's statement was not hearsay, redaction was unnecessary. Accordingly, we conclude that the dictates of Rule 14(c)(1) were not relevant to the present appeal; and that, as a result, this claim is without merit.

Jones also argues that the State clearly abandoned its conspiracy claim against Jones, thereby making Hampton's incriminating statements inadmissible. The rule in Tennessee is that "even though the declarations of the co-conspirator may be of a hearsay nature, the

admission into evidence of such declarations do not violate an accused's right of confrontation under the Sixth Amendment." State v. Lequire, 634 S.W.2d 608, 613 (Tenn. Crim. App. 1981) (citing Dutton v. Evans, 400 U.S. 74, 81-82, 91 S. Ct. 210, 215-16 (1970)), perm. to appeal denied (Tenn. June 1, 1982). The record supports Jones's assertion that the State abandoned its conspiracy claim against Jones. However, in light of the fact that Hampton's statements were nonhearsay, Jones's argument that the statements were inadmissible because of the inapplicability of the co-conspirator rule is moot. Hampton's statements were admissible because they were nonhearsay, not because they were a declaration of a co-conspirator.

## CONCLUSION

Upon review, we conclude that Hampton's statements are nonhearsay and that the trial court's admission of Hampton's statements did not violate Jones's Sixth Amendment right of confrontation under Bruton. Moreover, even if the trial court's admission of Hampton's statements was improper, such error was harmless. Accordingly, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE